# In the United States Court of Federal Claims

No. 13-291 C
Filed: July 25, 2014

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| * | |
| * | Administrative Procedure Act, 5 U.S.C. §§ 701–06 *et seq.*; |
| * | Competition in Contracting Act, 41 U.S.C. § 3301 *et seq.*; |
| * | Cooperative Farming Agreements; |
| * | Cooperative Land Management, 50 C.F.R. § 29.2 (1960); |
| * | Exec. Order. No. 12,996 (61 FED. REG. 13,647 (Mar. 25, 1996)); |
| * | Federal Grant and Cooperative Agreement Act, Pub. L. No. 95-224, 92 Stat. 3 (1978), codified, as amended, 31 U.S.C. §§ 6301–08; |
| * | Fish and Wildlife Act, Pub. L. No. 84-1024, 70 Stat. 1120 (1956); |
| * | Fish and Wildlife Coordination Act, Pub. L. No. 73-121, 48 Stat. 401 (1934), codified, as amended, at 16 U.S.C. §§ 661–667e; |
| JAY HYMAS d/b/a DOSMEN FARMS, * | Fish and Wildlife Coordination Act, Pub. L. No. 85-624, 72 Stat. 563 (1958), codified at 16 U.S.C. § 661; |
| Plaintiff, * | |
| * | Judgment on the Administrative Record; |
| v. * | Jurisdiction; |
| * | National Wildlife Refuge System Administration Act, Pub. L. No. 89-669, 80 Stat. 927 (1966), codified, as amended, at 16 U.S.C. § 668dd; |
| THE UNITED STATES, * | |
| Defendant. * | National Wildlife Refuge System definitions (50 C.F.R. § 25.12 (1960)); |
| * | National Wildlife Refuge System Improvement Act, Pub. L. No. 105-57, 111 Stat. 1252 (1997); |
| * | National Wildlife Refuge System Volunteer and Community Partnership Enhancement Act, Pub. L. No. 105-242, 112 Stat. 1574 (1998), codified, as amended, at 16 U.S.C. §§ 742a, 742f; |
| * | National Wildlife Refuge Volunteer Act, Pub. L. No. 108-327, 118 Stat. 1271 (2004); |
| * | Public Law No. 79-732, 60 Stat. 1080 (1946); |
| * | Public Law No. 80-537, 62 Stat. 240 (1948); |
| * | RCFC 37(c) (Failure to Disclose, to Supplement an Earlier Response). |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**James Patrick Schaefer**, Pro Bono Law, Palo Alto, California, Counsel for Plaintiff.[1]

**Douglas Glenn Edelshick**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND FINAL ORDER

BRADEN, *Judge*.

Since the 1970s, the United States Department of the Interior's ("Interior") United States Fish and Wildlife Service (the "Service") has awarded cooperative farming agreements to private individuals ("farmer-cooperators") who raise commercial crops on public lands in National Wildlife Refuges, if they agree to reserve a portion of their crops to feed migratory birds and wildlife.[2]

In 2012, Jay Hymas ("Plaintiff" or "Mr. Hymas") requested that the Service award him a cooperative farming agreement. The Service rejected him, because it utilized a "priority system," that affords incumbent farmer-cooperators preferential status. On April 25, 2013, Mr. Hymas filed a bid protest in the United States Court of Federal Claims challenging the Service's failure to award cooperative farming agreements on a competitive basis and seeking injunctive relief. Thereafter, the court stayed the case to allow the Service to consider Mr. Hymas's interest in being selected as a farmer-cooperator for the 2014 farming season. On or about January 21, 2014, the Service notified all of the incumbent farmer-cooperators that they had been selected to participate in the program for 2014; again Mr. Hymas was rejected, because he did not satisfy the Cooperative Farming Selection Process's "priority system." On January 24, 2014, the court lifted the stay.

On February 25, 2014, Mr. Hymas filed an Amended Complaint alleging that the Service's award of cooperative farming agreements for the 2014 farming season violated the Competition in Contracting Act, the Federal Grant and Cooperative Agreement Act, and the Administrative Procedure Act.

---

[1] Plaintiff appeared *pro se* until January 29, 2014, when Mr. Schaefer entered an appearance as Counsel of Record on behalf of Plaintiff.

[2] *See* DEP'T OF THE INTERIOR, FINAL ENVIRONMENTAL STATEMENT: OPERATION OF THE NATIONAL WILDLIFE REFUGE SYSTEM, at II-50 (1976) ("In F.Y. 1974, 611 cooperative farmers cultivated 163,000 acres of refuge land from which they received an average 70 percent share and harvested 1,307,249 tons of crops."); *see also id.* at III-13 ("Cooperative farming is done on 107 refuges, as well as on some of the larger Waterfowl Production Areas. . . . Another 24 refuges conduct farming operations using refuge personnel.").

The court has provided the following outline to facilitate review of this Memorandum Opinion And Final Order:

I.      THE RELEVANT STATUTES, REGULATIONS, AND AGENCY POLICY
        STATEMENTS GOVERNING REFUGE MANAGEMENT AND COOPERATIVE
        FARMING AGREEMENTS. ........................................................................... 5

        A.      Statutory Authority. .......................................................................... 5

        B.      Regulatory Authority. ........................................................................ 6

        C.      Agency Policy Statements. ................................................................ 7

                1.      The Departmental Manual. ..................................................... 7

                2.      The Refuge Manual. ................................................................ 7

                3.      The 1991 Fish & Wildlife Service Manual And The March 25, 1992
                        Director's Order No. 42. ......................................................... 9

                4.      The 1996 Cooperative Land Management Agreement Guidance. .............. 9

                5.      The 1996 Umatilla Refuge Cropland Management Plan. .......................... 9

                6.      The 1999 McNary Refuge Cropland Management Plan. .......................... 10

                7.      The December 31, 2006 Amendment 14 To Director's Order No. 42. .... 11

                8.      The 2007 Comprehensive Conservation Plan And Environmental
                        Assessment For The McNary And Umatilla Refuges. ............................. 11

II.     RELEVANT FACTS. ................................................................................... 12

        A.      Cooperative Farming Agreements In The McNary And Umatilla Refuges. ........ 12

        B.      The 2013 Farming Season. ................................................................ 12

III.    RELEVANT PROCEDURAL HISTORY. ................................................... 16

IV.     DISCUSSION. ............................................................................................ 20

        A.      The Government's Motion To Dismiss. ............................................ 20

                1.      The Government's Argument. ............................................... 20

                2.      Plaintiff's Response. .............................................................. 23

                3.      The Court's Resolution. ........................................................ 25

                        a.      Subject Matter Jurisdiction. ........................................ 25

                        b.      Standing ...................................................................... 27

                        c.      Mootness ..................................................................... 28

        B.      Plaintiff's Motion For Judgment On The Administrative Record And The
                Government's Response And Cross-Motion. ...................................... 29

1.      Plaintiff's Argument. .................................................................... 29

2.      The Government's Response And Cross-Motion. .................................... 35

3.      The Court's Resolution. .................................................................. 37

    a.      Standard Of Review. .............................................................. 37

    b.      Whether The Service's Priority Selection System Violates The Competition In Contracting Act. ..................................................... 38

    c.      Whether Any Of The Statutes Cited By The Government Exempt The Service From Complying With The Competition In Contracting Act. ....................................................................... 41

        i.      The 1958 Fish And Wildlife Coordination Act. .............. 41

        ii.     The 1966 National Wildlife Refuge System Administration Act. .................................................................... 42

        iii.    The 1998 National Wildlife Refuge System And Community Partnership Enhancement Act. ...................... 42

    d.      The Service's Priority Selection System Violates The Federal Grant And Cooperative Agreement Act. ...................................... 44

    e.      The 1958 Act Is Not Ambiguous And, In Any Event, 50 C.F.R. § 29.2 Cannot Exempt The Service From The Competition In Contracting Act. ........................................................................ 45

    f.      The Service Failed To Comply With Regulatory Authority. ......... 47

        i.      Standard Of Review. ....................................................... 47

        ii.     The Service's Failure To Comply With The Departmental Manual Was Arbitrary And Capricious And Prejudiced Plaintiff. .................................................................. 48

        iii.    The Service's Reliance On The Refuge Manual Was Arbitrary, Capricious, Lacked A Rational Basis, And Prejudiced Plaintiff. .......................................................... 49

C.      A Permanent Injunction Is Warranted. ................................................. 51

1.      Plaintiff's Argument. .................................................................... 51

2.      The Government's Response And Cross-Motion. .................................... 52

3.      The Court's Resolution. .................................................................. 53

V.      CONCLUSION. .................................................................................................. 55

Court Exhibit 1: McNary And Umatilla Refuges: Overview. ...................................................... 57
Court Exhibit 2: Umatilla Refuge. ............................................................................................... 58
Court Exhibit 3: McNary Refuge. ................................................................................................ 59
Court Exhibit 4: McNary Refuge, All Fields. .............................................................................. 60
Court Exhibit 5: McNary Refuge, Wallula Unit Field 1 .............................................................. 61
Court Exhibit 6: McNary Refuge, Burbank Slough Unit Fields 5, 6, and 8. .............................. 62
Court Exhibit 7: Umatilla Refuge, McCormack Unit Fields 1–5. ................................................ 63
Court Exhibit 8: Umatilla Refuge, Whitfield Unit Fields 1–6. .................................................... 64

## I.     THE RELEVANT STATUTES, REGULATIONS, AND AGENCY POLICY STATEMENTS GOVERNING REFUGE MANAGEMENT AND COOPERATIVE FARMING AGREEMENTS.

### A.     Statutory Authority.

The 1934 Fish and Wildlife Coordination Act (the "1934 Act") authorized the Secretaries of Agriculture and Commerce "to provide expert assistance to and to cooperate with Federal, State, and other agencies in . . . increasing the supply of game and fur-bearing animals and fish, in combating diseases, and in developing a Nation-wide program of wild-life conservation and rehabilitation."  Pub. L. No. 73-121, 48 Stat. 401 (codified, as amended, at 16 U.S.C. §§ 661–667e).

In 1946, Congress amended the 1934 Act to assist Federal and State agencies to manage wildlife through "cooperative agreements" with "Federal, State, and public or private agencies and organizations."  Pub. L. No. 79-732, §§ 1, 4, 60 Stat. 1080, 1080–81 (codified, as amended, at 16 U.S.C. §§ 661, 664).

In 1956, Congress enacted the Fish and Wildlife Act to create the United States Fish and Wildlife Service.  Pub. L. No. 84-1024, § 3, 70 Stat. 1120.

In 1958, Congress enacted the Fish and Wildlife Coordination Act (the "1958 Act"), which again amended the 1934 Act "to provide for more effective integration of a fish and wildlife conservation program with Federal water-resource developments."  Pub. L. No. 85-624, § 3, 72 Stat. 563 (codified as amended, at 16 U.S.C. §§ 661–64).  This Act also retained the text of the 1946 amendment, instructing the Service "to provide assistance to, and cooperate with, Federal, State, and public or private agencies and organizations" to protect migratory birds and wildlife habitat.  *Id.* § 2, 72 Stat. at 563.

In 1966, Congress enacted the National Wildlife Refuge System Administration Act (the "1996 Act") to designate areas within the United States to be set aside for the conservation of fish, wildlife, and waterfowl, and to create a network of habitats that today comprise the National Wildlife Refuge System.  *See* Pub. L. No. 89-669, 80 Stat. 926 (codified, as amended, at 16 U.S.C. § 668dd).  A later amendment required the Service to develop a Comprehensive Conservation Plan for each Refuge.  *See* 16 U.S.C. § 668dd(e)(1)(A).

In 1978, Congress enacted the Federal Grant and Cooperative Agreement Act. Pub. L. No. 95-224, 92 Stat. 3 (codified, as amended, at 31 U.S.C. §§ 6301–08) ("FGCAA"). Amended in 1982, the FGCAA directs federal agencies when to use procurement contracts, cooperative agreements, or grant agreements. *See* 31 U.S.C. §§ 6303, 6305.

In 1984, Congress enacted the Competition in Contracting Act ("CICA"), requiring federal agencies to use "full and open competition" when procuring "property or services." 41 U.S.C. § 3301.

In 1997, Congress enacted comprehensive legislation to manage the National Wildlife Refuge System (the "1997 Act"), by amending the 1966 National Wildlife Refuge System Administration Act. *See* National Wildlife Refuge System Improvement Act, Pub. L. No. 105-57, 111 Stat. 1252. According to the 1997 Act, the purpose of the Refuge System is to "conserv[e], manage[], and where appropriate, restor[e] . . . the fish, wildlife and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." *Id.* § 4, 11 Stat. at 1254 (16 U.S.C. § 668dd(a)(2)).

In 1998, Congress amended the Fish and Wildlife Act of 1956 "to promote volunteer programs and community partnerships for the benefit of national wildlife refuges[.]" *See* National Wildlife Refuge System Volunteer and Community Partnership Enhancement Act of 1998, Pub. L. No. 105-242, 112 Stat. 1574 (the "1998 Act"). The 1998 Act authorized Interior to "enter into a cooperative agreement (within the meaning of [the FGCAA]) with any partner organization, academic institution, or State or local government agency to carry out 1 or more projects or programs for a refuge[.]" *Id.* § 5, 112 Stat. at 1574 (16 U.S.C. § 742f(d)(2)(A)).

In 2004, Congress reauthorized the 1998 Act and added the following text: "*Notwithstanding* [*the FGCAA*], the Secretary of Interior may negotiate and enter into a cooperative agreement with a partner organization, academic institution, State or local government agency[.]" 16 U.S.C. § 742f(d)(2)(A).

## B.    Regulatory Authority.

In 1960, the Service promulgated regulations under the Fish and Wildlife Coordination Act to govern how the national wildlife refuges should be managed. As to cooperative agreements, they provide:

> Cooperative agreements with persons for crop cultivation, haying, grazing, or the harvest of vegetative products, including plant life, growing with or without cultivation on wildlife refuge areas may be executed on a share-in-kind basis when such agreements are in aid of or benefit to the wildlife management of the area.

50 C.F.R. § 29.2 ("Cooperative land management"); *see also* Title 50—Wildlife: Revision and Reorganization of Title, 25 FED. REG. 8,397, 8,413 (Sept. 1, 1960) (notice of final rule, including 50 C.F.R. § 29.2); 25 FED. REG. at 8,409 (requiring the use of "cooperative agreements" for state cooperation with wildlife refuge management) (codified, as amended, at 50 C.F.R. § 25.12).

In 1996, the President of the United States established four "guiding principles" for managing the Refuge System: public use, habitat, partnerships, and public involvement. *See* Exec. Order No. 12,996, 61 FED. REG. 13,647 (Mar. 25, 1996).

On October 18, 2000, the Service issued additional regulations under the National Wildlife Refuge System Improvement Act of 1997, that defined "refuge management activity" as conduct, either by the Service or a Service-authorized agent, such as a contractor, that "fulfill[s] one or more purposes of the national wildlife refuge[.]"  65 FED. REG. 62,458, 62,467 (Oct. 18, 2000) (amending 50 C.F.R. § 25.12 to include definitions of "refuge management activity" and "refuge management economic activity").  "Refuge management economic activity" was defined as a "refuge management activity" resulting "in generation of a commodity which . . . can be sold . . . or traded," such as "[f]arming."  *Id.* at 62,481; *see also id.* at 62,461–62 (discussing public comments received about the proposed definitions).

## C.    Agency Policy Statements.

The Service is bound by Interior's Departmental Manual.  In addition, the Service has issued at least seven other policy statements that discussed how the refuges should be managed.

### 1.    The Departmental Manual.

Interior maintains an online Departmental Manual that is periodically updated.[3]  The Departmental Manual is "the authorized means of documenting and issuing instructions, policies, and procedures that have general and continuing applicability to Departmental activities."  011 DEP'T OF INTERIOR DEPARTMENTAL MANUAL ("DM") § 1.1 (2001).  Through the Departmental Manual, the Secretary communicates instructions and guidance to all of Interior's components. *See* 011 DM § 1.2 (2001).  The Departmental Manual "serve[s] as the primary source of information on organization structure, authority to function, and policy and general procedures." 011 DM § 1.2 (2001).  In the absence of superseding authority, "[b]ureaus and offices must comply with the provisions of the [Departmental Manual]."  011 DM § 1.2(B) (2001).

### 2.    The Refuge Manual.

In 1942, the Service issued a "Field Manual for Wildlife Refuges."[4]  A second Refuge Manual was issued in 1957 and a two-volume third edition in 1982.  Thereafter, sections of the Refuge Manual periodically were updated throughout the 1980s.  Specifically, in 1985, the Service revised Section 4,[5] "Cropland Management," to provide the Service with guidance about permitted activities within National Wildlife Refuges, stating that, "[i]n situations where

---

[3] The Departmental Manual is published at http://elips.doi.gov/elips/browse.aspx.

[4] *See* Tom Worthington, U.S. Fish & Wildlife Service, *Two Dogs, One Cat and Three Refuge Manuals*, *available at* http://www.fws.gov/refuges/refugeupdate/marchapril_2011/refugemanuals.html (last updated Feb. 28, 2014) (describing the history of the Refuge Manual).

[5] The May 24, 1985 version (Release 13) of section 4 of the Refuge Manual is reproduced at AR 123–39.

[wildlife] objectives cannot be met through maintenance of more natural ecosystems, the more intensive and artificial method of cropland management may be employed.  The acreage devoted to croplands will be the minimum required to meet approved objectives."  6 FISH & WILDLIFE SERV. REFUGE MANUAL ("RM") § 4.1 (1985).  Therein, "cooperative farming" is defined as "[c]ropland management carried out by a private citizen on refuge lands, under the terms of a 'Cooperative Farming Agreement,' in which the cooperator (private citizen) provides labor, equipment, and materials and the Government provides land, equipment, and/or materials and the resulting crop is shared by the cooperator and the Government."  6 RM § 4.3(B) (1985). Refuges that wanted to utilize "cooperative farming" were instructed to submit an approved current cropland management plan to the Service, "upon which annual operations and changes [would be] based."  6 RM § 4.4(A) (1985).  In addition, "[a]ll contract farming [was to] be documented," by a "contract farming agreement" that must be compatible with the "purposes for which the refuge was established."  6 RM § 4.4(D) (1985).  Potential farmer-cooperators would be selected "according to the procedures outlined in 5 RM 17."  6 RM § 4.8(A)(3) (1985). Cooperative farming agreements were "normally" intended to be multi-year agreements, because "[c]ooperators should be given a long-term interest in the stewardship of the soil."  6 RM § 4.8(A)(1) (1985).

Section 17 of the Refuge Manual, "Administration of Special Uses,"[6] identifies three methods for selecting "permittees."  The preferred method is the use of formal or informal competitive bids.  *See* 5 RM § 17.11(A)(1)(c) (1986) ("Generally, use of one of the above-described processes [competitive bids or other equitable process] is preferable to a priority system."); *see also* 5 RM § 17.11(A)(1)(a) (1986) ("To avoid favoritism in the bid process, the manager should request bid quotations from any persons or agencies who may be interested in the specialized use.").  An alternative method allows the Service to use equitable selective procedures, "such as lottery, auction, or first-come, first-served."  5 RM § 17.11(A)(1)(b) (1986). Where a "priority system is more appropriate to program needs," however, the Service also could select participants in the following order of priority: (1) previous cooperators; (2) former landowners; (3) former tenants; (4) resident neighbors; (5) non-resident neighbors; (6) applicants from outside the local vicinity.  *See* 5 RM § 17.11(A)(1)(c) (1986).  Section 17 also states that cooperative farming agreements are "a type of Special Use Permit," not a formal cooperative agreement.[7]  5 RM § 17.11(C)(1)(d) (1986) (referencing Cooperative Farming Agreement Form 3-1492; Addendum Form 3-1492a; 6 RM § 4; 50 CFR § 29.5).

---

[6] The August 20, 1986 version (Release 15) of sections 17 through 17.14 of the Refuge Manual, together with section 17 exhibits 1–7, is reproduced at AR 140–74.  The October 21, 1986 version (Release R-007) of section 17.9 of the Refuge Manual is reproduced at AR 175–78.

[7] The Refuge Manual defines "Special Use Permit" as a "permit issued for special recreation for uses such as group activities, recreation events, motorized vehicles, and other specialized uses."  5 RM § 17 Ex. 7 at 2 (1986) (reproduced at AR 174).  In contrast, "[c]ooperative agreements are formal agreements executed by the Service involving the exchange of goods, services, or privileges, but not financial transactions[.]"  5 RM § 17.11(C)(1)(d) (1986).

3.     **The 1991 Fish & Wildlife Service Manual And The March 25, 1992 Director's Order No. 42.**

In 1991, the Service issued the first Fish & Wildlife Service Manual to provide internal policy and management guidance.[8]   *See* 011 FISH & WILDLIFE SERV. MANUAL ("FW") § 1 (2006) ("Description, Authority, and Responsibilities for the Service Manual").   On March 25, 1992, Director's Order No. 42[9] revoked "all manuals, handbooks, and other directives issued prior to May 29, 1991," as of September 30, 1993.   The stated purpose of this Order was to consolidate "the myriad of separate manuals, handbooks, and other directives within the Service" into the Service Manual.   Pl. MJAR at App'x 585; Gov't Mot. 30–31.

4.     **The 1996 Cooperative Land Management Agreement Guidance.**

On January 29, 1996, the Assistant Regional Director for Refuges and Wildlife issued "Cooperative Land Management Agreement Guidance" ("1996 Guidance").   AR 179–81. Therein, Cooperative Land Management Agreements were described as "especially appropriate for working with non-profit organizations to reach refuge goals" and "guided by a share-in-kind principal."   AR 180 (referencing 50 C.F.R. § 29.2).   The 1996 Guidance also distinguished cooperative land agreements, requiring both parties to mutually and equally benefit, from special use permits or cooperative farming agreements, requiring the Service to "provide more land than is actually necessary to accomplish it[s] habitat management goals in order to provide an economic incentive to the cooperator."   AR 180.

5.     **The 1996 Umatilla Refuge Cropland Management Plan.**

The Umatilla National Wildlife Refuge ("Umatilla Refuge") was established in 1969 to mitigate habitat loss from the construction of the John Day Lock, Dam and Reservoir ("Lake Umatilla").   *See* Pub. L. No. 80-537, 62 Stat. 240, 240–41 (1948) ("[R]eal property which is under the jurisdiction or control of a Federal agency and no longer required by such agency . . . may  . . .  be transferred . . . to the Secretary of the Interior if the real property has particular value in carrying out the national migratory bird management program."); *see also* U.S. FISH & WILDLIFE SERV., MCNARY AND UMATILLA NATIONAL WILDLIFE REFUGES: COMPREHENSIVE CONSERVATION PLAN AND ENVIRONMENTAL ASSESSMENT 1-12 to 1-14 (2007)[10] ("MCNARY & UMATILLA CCP") (describing the history of Umatilla Refuge).   The Umatilla Refuge is considered "an important migration and wintering area for waterfowl and other birds in the Columbia River Basin, as well as one of the few remaining areas supporting and preserving the native shrub-steppe community."   AR 61.

---

[8] The Fish & Wildlife Service Manual is published at http://www.fws.gov/policy/manuals.

[9] Director's Order No. 42, together with Amendments 13 to 15, are available online.   *See* http://www.fws.gov/policy/do.cfm.   Director's Order No. 42, together with Amendments 1 and 12, may be found at Pl. MJAR App'x 585–88.

[10] *Available at* http://www.rivers.gov/documents/mcnary-ccp.pdf.   The MCNARY & UMATILLA CCP also was included as an Appendix to Plaintiff's February 17, 2014 Motion For Judgment On The Administrative Record.   *See* Pl. MJAR at App'x 1–584.

In 1996, the Service issued the Umatilla Cropland Management Plan ("Umatilla Plan") to "provide quality public visitation," and increase the concentration of waterfowl prey for threatened and endangered species, such as bald eagles. AR 63. The Umatilla Plan identified several reasons why the Service should grow crops on refuge land, *i.e.*, loss of waterfowl food and habitat from wetlands degradation; long waterfowl hunting seasons; and a shift from traditional crop production to vineyards, orchards, and tree lots. AR 63.

The Umatilla Plan described three alternative production methods. Alternative 1, "Force Account Farming,"[11] allowed Refuge staff to manage all crop production and required them to farm 360 acres, at an estimated $429,000 in startup costs and $92,890 in annual production costs. AR 67–68. Alternative 2, "Contract Farming," allowed the Service to contract out the costs of farming the same 360 acres identified in Alternative 1. The costs of Alternative 2 were estimated to exceed Alternative 1. AR 69. Alternative 3, "Cooperative Agreement Farming," allowed the Service to negotiate crop development and harvesting by private farmer-cooperators, who were responsible for all costs of production, but were required only to grow crops that could be utilized to feed migratory birds and wildlife. AR 69–70. The cost of Alternative 3 to the Service was minimal, but substantial land rental revenue would be lost that otherwise could be used to pay for feed. AR 70. The Service selected Alternative 3 as the preferred production method. AR 69. Before the Umatilla Plan was implemented, two farmers harvested 1,383 acres, from which Umatilla Refuge wildlife received the benefit of 344 acres of crop feed. AR 69, 73.

Pursuant to the Umatilla Plan:

> Cooperators [were to be] selected in accordance with Refuge manual guidelines as outline[d] in 5 RM § 17.11A and [were to be] issued [] three year Cooperative Farming Agreement[s,] as outlined in 6 RM § 4.8. Cooperative Farming Agreements [would be] amended annually to include specific crops, shares and any other special conditions required for the farming season.

AR 73.

### 6.     The 1999 McNary Refuge Cropland Management Plan.

The McNary National Wildlife Refuge ("McNary Refuge") was established in 1956, when the United States Department of the Army made the land surrounding the Lake Wallula Reservoir available to Interior for conservation purposes and mitigation of wildlife habitat loss caused by the construction of the McNary Lock and Dam Project. AR 44; *see also* MCNARY & UMATILLA CCP 1-8 to 1-12 (describing the history of McNary Refuge). The McNary Refuge has particular ecological importance as a nesting area for the Great Basin Canada Goose and also serves as a wintering area for mallards and subspecies of Canada Geese. AR 44.

In 1999, the Service issued the McNary Cropland Management Plan (the "McNary Plan"), which was based on the Umatilla Plan. *Compare* AR 43–59 (McNary Plan), *with* AR 60–84 (Umatilla Plan). Both Plans were premised on the need to maintain a farming program,

---

[11] "Force account" is defined as "[a]ny cropland management operation carried out by government employees." 6 RM § 4.3(C) (1985).

because of: degraded area wetlands that did not provide sufficient food for waterfowl; an unusually cold, late winter with an extended hunting season; and changes in area cropping patterns, with reductions in corn crops.  AR 46–47 & Tbl. 1.

The McNary Plan, like the Umatilla Plan, considered three production methods for growing crops.  The Service estimated that Alternative 1, Force Account Farming, would utilize 300 acres at an estimated annual cost of $77,409, based on a 1992 Washington State University study.  AR 48–49.  The costs for Alternative 2, Contract Farming, were estimated to exceed those of Alternative 1.  Alternative 3, Cooperative Agreement Farming, would impose minimal costs on the Service, because a farmer-cooperator was responsible for all costs of production, but would produce a specified amount of crops for use by the McNary Refuge as bird and wildlife feed.  AR 50.  Prior to the McNary Plan, two cooperators farmed 540 acres of the McNary Refuge; the remaining 160 acres were set aside for cropland that the Service considered to be "economically undesirable for the existing cooperators."  AR 50.

Under the McNary Plan, as with the Umatilla Plan:

Cooperators [were to be] selected in accordance with Refuge manual guidelines as outline[d] in 5 RM § 17.11A and [were to be] issued [] three year Cooperative Farming Agreement[s,] as outlined in 6 RM § 4.8.  Cooperative Farming Agreements [would be] amended annually to include specific crops, shares and any other special conditions required for the farming season.

AR 52.

### 7.      The December 31, 2006 Amendment 14 To Director's Order No. 42.

The Service issued a series of amendments to Director's Order No. 42, culminating with the December 31, 2006 Amendment 14 extending the "termination date" of the Refuge Manual to December 31, 2007.  *See* Director's Order No. 42, Amend. 14; *see also* Director's Order No. 42, Amend. 13; Pl. MJAR at App'x 587–88.  The December 31, 2007 deadline passed without further amendment; so, on January 1, 2008, the Refuge Manual was "terminated."

### 8.      The 2007 Comprehensive Conservation Plan And Environmental Assessment For The McNary And Umatilla Refuges.

In May 2007, the Service, in coordination with the Mid-Columbia River National Wildlife Refuge Complex, issued a Comprehensive Conservation Plan and Environmental Assessment for the McNary and Umatilla Refuges (the "2007 Plan").  The 2007 Plan explained that farming in the McNary and Umatilla Refuges "is a critical . . . operation in meeting purposes of the Refuge (*e.g.* 'particular value in carrying out the National Migratory Bird program,' as well as goals and objectives established in the [2007 Plan.])"  MCNARY & UMATILLA CCP B-74 to B-75, C-65 to C-66.

The 2007 Plan lists thirteen "Refuge Goals," among which were:

1. Manag[ing] high quality food and sanctuary to support large concentrations of migratory waterfowl.

* * *

5. Provid[ing] high quality riparian habitats for the benefit of nesting and migrating birds . . . and other riparian wildlife.

McNary & Umatilla CCP 1-20 to 1-21.

## II.    RELEVANT FACTS.[12]

### A.    Cooperative Farming Agreements In The McNary And Umatilla Refuges.

The cooperative farming agreements in this case concern federal land within the McNary and Umatilla Refuges, located along the Columbia River in southeastern Washington State and the northeastern area of Oregon.  Court Exhibits 1–3.  The Service operates these Refuges as migration and wintering areas for Canada geese, other waterfowl, and birds.  These agreements allow a farmer-cooperator to use or sell 75 percent of the crop yield on a per-acre basis; the remaining 25 percent is considered as refuge shares, *i.e.*, crops used to feed migratory birds and other wildlife.  The cooperative farming agreements require the farmer-cooperators to be responsible for all production costs, except the maintenance of underground irrigation systems and pumps.

### B.    The 2013 Farming Season.

On June 5, 2012, Mr. Hymas contacted the McNary Refuge Manager to express an interest in three fields for the 2013 farming season.  AR 86, 105, 114.  In mid-June 2012, the Refuge Manager informed Mr. Hymas that the Service planned to put Field 4 and the Library Field up for bid, but Field 3, in which Mr. Hymas expressed an interest, was subject to an existing cooperative farming agreement.[13]  AR 86–87, 105; *see also* Court Exhibit 4.  Mr. Hymas was advised, however, that the Service would "begin the process for selecting a new cooperator [for the Library Field and Field 4] in the near future," after obtaining estimates to repair the irrigation systems.[14]  AR 86, 106–07.  Over the next few months, Mr. Hymas made

---

[12] The relevant facts discussed herein were derived primarily from the February 5, 2014 Amended Complaint and the Administrative Record (AR 1–220).

[13] Mr. Hymas believed all three fields were fallow and eligible for public bid.  AR 114 (4/5/12 Protest Statement) ("I . . . presented my idea to Mr. Glass to farm the three areas in question that I notice[d] for some years [] were not farmed or maintain[ed] but had been left to go fallow in weeds. . . . Area A [Field 3a], I was told was already with an agreement but that the operator has not been farming it, no explanation was given for the non-performance.").

[14] In the past, because the Service found it difficult to find a farmer-cooperator willing to use the old, labor-intensive wheel line irrigation on Field 4 (83 acres) and the solid set irrigation on the Library Field (20 acres), both fields in McNary Refuge lay fallow after 2008.  AR 85; *see also* Court Exhibit 4.  In 2011, as part of a land exchange with the Washington State Department of Transportation, the Service installed equipment at the Library Field to improve irrigation.  AR 85.

numerous inquiries about how the cooperative farming program worked.  AR 86, 114.  In December 2012, Mr. Hymas advised the Service that he was willing to pay for the cost of the required irrigation equipment for Field 4; the Refuge Manager responded that he still was waiting for an estimate.  AR 86, 114–15.

In February 2013, the Refuge Manager advised Mr. Hymas that preliminary estimates were obtained to repair the irrigation system in the Library Field, but that the Service was still waiting for an estimate to repair the irrigation system in Field 4.  AR 86.  Mr. Hymas continued to express an interest in paying for the necessary irrigation equipment and undertaking the responsibilities of a farmer-cooperator "as the [2013] growing season neared."  AR 86.  During the first week of March 2013, the Refuge Manager obtained a second cost estimate for the irrigation system for Field 4 and reviewed the Umatilla and McNary Cooperative Farming Programs, particularly with respect to Field 3.  AR 87.

Thereafter, Mr. Blasdel, an incumbent cooperator who farmed 183 acres in the McNary Refuge, offered to pay for the necessary irrigation improvements to Field 3a, and "[b]ecause [he was] a former cooperator, [the Service decided] to offer [a] 2013 Cooperative Farming Agreement to him[.]"  AR 86–87.  On March 14, 2013, the Refuge Manager met with Mr. Blasdel and he also agreed to farm the Library Field under an existing cooperative farming agreement.  AR 88.  The next day, Mr. Hymas was informed by the Service that "there would be no available [cooperative farming agreements] for him to participate in."  AR 88.

On March 17, 2013, Mr. Hymas responded:

> As I am sure you can guess, I was disappointed in the information you gave me wherein you stated that you had a meeting in which it was determined not to lease any of the Refuge's farm land that we had under discussion.  I must admit I do not understand how that determination could be made at this point in time when we have been working together since June . . . to facilitate a bid proposal for the land.

> *    *    *

> [O]n Feb. 22nd you [told] me to expect something in the Tri-City Herald on the 25th since you were expecting that day the price quote from Irrigation Specialists regarding the pump motor.  How did you go from being that close to being now so far away?  I would kindly ask for an explanation of what happened on the 22nd and 25th of February to bring us to where we are now.

> *    *    *

> A reason you gave is that now it is determined that the fowl will have enough food, again I would request to know what has changed recently to establish that there will be sufficient food this coming winter.  Have there been other bids that have recently concluded that I am not aware of to greatly increase the production?  Was a study recently completed?  If so can I get a copy?

AR 104.

On March 22, 2013, the Refuge Manager replied that the Service rejected Mr. Hymas's offer, because the "[w]ildlife food resource needs could adequately be met through the Refuge share under the existing Cooperative Farming Agreements."  AR 106.  Mr. Hymas also was advised that the Service decided that, because of its small size, the Library Field "should be joined with the other adjoining cooperatively farmed field to allow the Refuge maximum flexibility in placement of food resources at desired locations."  AR 107.  On March 29, 2013, Mr. Hymas met with the Refuge Manager for a debriefing.  AR 94.

On April 3, 2013, Mr. Hymas renewed his request "to be included in any of the 8 contracts that will be given this year" and receive information about the cooperator agreements that were awarded to Mr. Blasdel.  AR 94.  In the following days, the Service issued cooperative farming agreements for 2013, as described below.

On April 4, 2013, the Service finalized a one-year agreement with Doug Strebin to farm the 31-acre Wallula Field in the McNary Refuge, because he "control[led] the only method of irrigating this circle [(the 1/4 irrigation circle that comprises Wallula Field 1)]."  AR 1–5, AR 90.  On April 5, 2013, the Service advised Mr. Hymas that he should expect a letter from the Service's Mid-Columbia River National Wildlife Refuge Complex, about participation in the current cooperative farming agreements.  AR 94; *see also* AR 93.

On April 7, 2013, Mr. Hymas requested that the Service provide him with "the current Cropland Management Plan(s) for the 8 cont[r]acts in question," as well as "feed requirement data."  AR 98.  On April 8, 2013, Mr. Hymas asked for "the latest executed contracts" (not the unsigned "anticipated ones for the future"), and repeated his request "to bid on each of these proposed contracts."  AR 96.

On April 12, 2013, the Service finalized a one-year agreement with an incumbent cooperator, Vern Frederickson, to cultivate five fields, comprising 597 acres, in the Umatilla Refuge.  AR 6–10, 91.  On that same date, the Service also finalized a one-year agreement with Jody Maddox, another incumbent cooperator, to farm six fields, comprising 685 acres, in the Umatilla Refuge.  AR 11–15, 91–92.

On April 15, 2013, the Service notified Mr. Hymas that "[w]e are not soliciting bids for the cooperative farming program on the Complex for this year."  AR 93, 96.  The Service also informed Mr. Hymas that it would not entertain new bidders, unless there was a problem with existing cooperators.  AR 93 ("Open bids for cooperative farming on the Refuges are sought when new lands are brought into the farming program or if existing farmlands become available due to the loss of a cooperator.  Once initially established, we generally continue to utilize existing cooperators for those lands unless there is a problem with their performance.").

On April 16, 2013, Mr. Hymas again renewed his request for "the last effective contracts (agreements) for the 8 farm contracts."  AR 97.  On that date, however, the Service finalized a one-year agreement with John Peterson, also an incumbent cooperator, to farm five fields, comprising 275 acres, in the McNary Refuge.  AR 16–20, 90–91.  In addition, the Service also finalized a four-year agreement with Larry Pierce, an incumbent cooperator and prior landowner, to farm one 42-acre field in the McNary Refuge.  AR 21–25, 89.

14

On April 18, 2013, Mr. Hymas sent a *pro se* email protest to the Service objecting to the use of non-competitive cooperative farming agreements, as fraudulent, "per 48 Code of Federal Regulations 33.103." AR 99–102. Attached to the April 18, 2013 email was a "Protest Statement," providing a timeline of Mr. Hymas's interactions with the Service. AR 114–19; *see also* AR 115–16 ("[T]he [Service has] behav[ed] badly, untruthfully and with deception to continue a historical pattern of non-comp[eti]tive agreements against law (see Competition in Contract[ing] Act, 41 U.S.C. § 253 [now 41 U.S.C. § 3301] and Federal Acquisition Regulations, FAR) and department regulations (see 5 RM [§] 17 and 6 RM [§] 4) as well as giving, at a minimum, a gross appearance of impropriety and corruption."); AR 116 ("Mr. Stenvall . . . admitted to . . . unilaterally fixing the prices of the non-cooperative bid farming cont[r]acts at 25% share-crop rather than [using] the regulatory required bidding process[.]"). The "Protest Statement" also restated that Mr. Hymas was willing to farm the 160 acres that have labor-intensive wheel lines, although the Service found that land to be "economically undesirable for the existing cooperators." AR 117 ("Just because some farmers would turn their nose up at using a lowly manual method for irrigation does not mean that another would not, as in [my] case[.]").[15]

On April 19, 2013, Mr. Hymas filed another protest with the Service. AR 88. On April 23, 2013, the Service denied that protest. AR 88.

On April 26, 2013, the Service finalized a three-year agreement with Mr. Blasdel to farm eight fields, totaling 238.6 acres, in the McNary Refuge. AR 26–30, 41–42, 88.[16] Each of the cooperative farming agreements issued for the 2013 season granted the farmer-cooperator the "privileges of using lands of the National Wildlife Refuge System . . . for the cultivation, production, and/or harvesting of agricultural crops, on a share basis[.]" AR 1 (4/4/13 Strebin Cooperative Farming Agreement); *see also* AR 1–2 (listing special conditions in the Cooperative Farming Agreement). In addition, each agreement included a Revocation Policy that allowed the Service, at its discretion, to revoke an agreement and "take possession of the premises for [the Service's] own and sole use *provided* that the Service shall make available to the Cooperator his rightful share of growing crops." AR 3 (Cooperative Farming Agreement General Conditions section F) (emphasis in original).

---

[15] On April 18, 2013, Mr. Hymas's "Protest Statement" was forwarded to the Assistant Regional Director for Refuges in the Pacific Region, with the Project Leader's explanation that he "sat down with [Mr. Hymas for about 1 1/2 [hours] and [Mr. Hymas] feels because he came in 10 months ago to talk to [the Refuge Manager] about some farm fields that were fallowed that he is entitled to bid on them." AR 110.

[16] The Blasdel cooperative farming agreement utilized an 83 percent cooperator/17 percent Refuge split; the other agreements used a 75/25 percent split. *Compare* AR 1 (Strebin cooperative farming agreement, identifying 23.25 acres as the cooperator's share and 7.75 acres as the Service's share), *with* AR 41 (Blasdel cooperative farming agreement, identifying 198.6 acres as the farmer-cooperator's share and 40 acres as the Service's share).

III.     RELEVANT PROCEDURAL HISTORY.

On April 25, 2013, Mr. Hymas filed a *pro se* Complaint in the United States Court of Federal Claims, alleging that the Service's non-competitive process in awarding cooperative farming agreements in the McNary and Umatilla Refuges was contrary to law, not rational, and arbitrary and capricious.  Compl. ¶ 1.  The same day, Mr. Hymas filed an Application For Temporary Restraining Order and a Motion For Preliminary And Permanent Injunctions to enjoin the Service from proceeding with the 2013 cooperative farming agreements.

The day after the Complaint was filed, the Service began to create a *post-hoc* record to justify the award of the April 2013 Cooperative Agreements, without competition.  First, in an April 26, 2013 email, the Service's Project Leader described a past conversation with the Deputy Chief of Refuges, about Mr. Hymas's protest:

> [The Deputy Chief of Refuges] did not see how Jay Hymas had any standing *as we had not put out a public offering*, Jay is not under some sort of existing agreement that we altered, and our charge is to provide for the wildlife resources we are entrusted to manage within existing policy and regulations, not to provide a livelihood for someone who wishes to work with or for the refuge in some sort of capacity.  Furthermore *this wasn't a procurement and therefore procurement guidelines are not applicable to this situation.*

AR 109 (emphases added).

Next, an April 29, 2013 "Selection of the cooperator for McNary National Wildlife Refuge fields" was created to explain the Service's decision to select one or more cooperators for the 2013 farming season for the McNary Refuge Fields 3 a–d, 7 a–c, 4, and the Library Field ("4/29/13 Stenvall Statement").  AR 85–88; *see also* Court Exhibit 4.  This Statement was prepared "to *facilitate judicial review*, given that no other document in existence shows the agency's decision making process."  AR 85 (emphasis added).  According to the April 29, 2013 Statement, Mr. Blasdel, an existing farmer-cooperator with "over a decade of experience working with McNary [Refuge] as a cooperator," proposed, in February 2013, to improve the irrigation systems on Fields 3a and 3b that he previously farmed.  AR 86.  Mr. Blasdel was awarded  a cooperative farming agreement, according to the Statement, because "Mr. Blasdel . . . has [a] proven . . . capability to provide a successful farm season . . . [and] [he] owns the irrigation pivots used on Fields 7 a–c and the wheel-line systems on Field 3b."  AR 86.  The April 29, 2013 Statement further explained that allowing a farmer-cooperator to operate only the Library Field would limit the Service's ability to provide adequate wildlife food supply during the critical hunting season.  AR 87 ("If the Library Field were included as part of a larger [cooperative farming agreement with a single cooperator], this would give the Refuge the opportunity to move its share from fields in areas open to hunting to areas closed to hunting[.]").  And, if a single farmer-cooperator worked only the Library Field, the Service would have to allow the farmer to take 75 percent of the crop under the cooperative farming agreement, leaving only five acres out of twenty for wildlife needs.  AR 87 ("This flexibility would be impossible if the Library [F]ield was farmed under a separate [cooperative farming agreement] by Mr. Hymas.").

On April 29, 2013, the Refuge Manager prepared another post-award document to justify the Service's process for the 2013 season for the McNary Refuge Fields 5, 6 a–c, 8; Wallula Field 1; and Pierce Field; as well as the Umatilla Refuge McCormack Fields 1–5 and Whitcomb Fields 1–6. AR 89 ("4/29/13 Glass Statement"). This Statement also was prepared "to facilitate judicial review, given that no other document in existence shows the agency's decision making process" and provide the reasons why each farmer-cooperator was accepted. AR 89. Therein, the Service explained that Mr. Larry Pierce was selected to farm McNary Refuge's Pierce Field, since he was a prior landowner and therefore "eligible under the 'priority system[,]' described in the Refuge Manual." AR 89 (citing 5 RM § 17.11 (A)(c)(2) (1986) ("Priority is given to applicants who owned the refuge lands at the time the land was acquired by the Federal [G]overnment.")). Mr. Hymas was not selected, "because he does not have the experience of farming this specific field nor does he possess the preference status of a prior landowner." AR 89. In addition, Mr. Doug Strebin was selected to farm McNary Refuge's Wallula Field 1 for the 2013 season, because he had a lease with Broetje Orchards to farm the other three-quarters and access to irrigation. AR 90; *see also* Court Exhibit 5. Mr. Hymas was not selected, "because without irrigation capability no agreement with him could provide the wildlife food resources that Mr. Strebin will supply." AR 90. Mr. John Peterson also was selected to farm McNary Refuge Fields 5, 6 a–c, and 8, for the 2013 season, because he had been a farmer-cooperator for the McNary Refuge for more than a decade. AR 90 (citing 5 RM 17.11 A.(c).1 (1986)); *see also id.* at 16–20; Court Exhibit 6. In addition, he made a multi-year investment in the center-pivot irrigation system that he owns and uses at Fields 5 and 8. AR 90. Mr. Hymas was rejected, "because with any new cooperator there is a risk that they will not have the experience or capability to conduct farming operations in accordance with Refuge requirements." AR 90. The 4/29/13 Glass Statement further explained that in 1969, the Army Corps acquired the McCormack Fields via eminent domain from the Frederickson family, who continued to farm the land as cooperators. AR 91. As a prior landowner and incumbent farmer-cooperator, the Service afforded Mr. Vern Frederickson a preference to farm Umatilla Refuge McCormack Fields 1–5 for the 2013 season. AR 91 (citing 5 RM § 17.11(A)(c)(1) and (2)); *see also id.* at 6–10 (cooperative farming agreement); Court Exhibit 7. Mr. Hymas was rejected, "because with any new cooperator there is a risk that they will not have the experience or capability to conduct farming operations in accordance with Refuge requirements." AR 91. Finally, the 4/29/13 Glass Statement explained that Mr. Jody Maddox was selected to farm Umatilla Refuge Whitcomb Fields 1–6 for the 2013 season. AR 91; *see also id.* at 11–16 (cooperative farming agreement); Court Exhibit 8. Mr. Maddox had participated as a farmer-cooperator for more than a decade, giving him preference. AR 91–92 (citing 5 RM 17.11(A)(c)(1)). In addition, Mr. Maddox invested in a center pivot irrigation system used on the Whitcomb Fields. AR 91–92. Mr. Hymas was rejected, "because with any new cooperator there is a risk that they will not have the experience or capability to conduct farming operations in accordance with Refuge requirements." AR 92.

On May 1, 2013, the Government filed the Administrative Record (AR 1–189).

On May 6, 2013, the Government filed a Motion To Dismiss, Or, In The Alternative, Motion For Judgment Upon The Administrative Record. On May 13, 2013, Plaintiff filed a Response. On May 13, 2013, the Government filed a Reply. On May 20, 2013, Plaintiff filed a First Supplemental Memorandum In Support Of Plaintiff's Motion To Grant Jurisdiction.

In a June 18, 2013 status conference, the court indicated that issuing injunctive relief in the middle of the farming season would not be in the public interest.  In a June 24, 2013 status conference, the court advised the parties that the case would be stayed, if the Government agreed to notify Mr. Hymas when he could submit a bid to participate in the 2014 farming season.  On July 22, 2013, the court issued an Order denying Plaintiff's motion for an injunction as to the 2013 cooperative farming cycle and stayed the case until the 2014 selection process could take place.

* * *

On November 18 and 21, 2013, the Service requested that each incumbent farmer-cooperator indicate by December 5, 2013, if they wished to continue to participate in the program for the 2014 season and were "interested in increasing the acreage that [they] currently farm under a cooperative farming agreement."  AR 194–97.  All of the existing farmer-cooperators expressed an interest in participating in the 2014 season.  AR 206–08, 211.

On November 21, 2013, the Service also sent a questionnaire to Mr. Hymas, requesting that he provide information by December 4, 2013, so that the Service could consider whether he still was interested in participating in the McNary and Umatilla Refuge Cooperative Farming Programs for 2014.  AR 198.  The questions focused mainly on his prior farming experience. AR 198.

On November 21, 2013, the Project Leader also issued a document entitled "Cooperative Farming Selection Process" ("11/21/13 Stenvall Statement") to explain that

> the only criterion for selecting cooperators in this program is their capability to perform the requirements of the cooperative farming agreement.  Considerations relevant to the capability to perform—such as experience participating in the cooperative farming program (previous cooperators), experience with using the parcel of land to be farmed (former landowners and former tenants), and experience with using the land in the local vicinity (resident neighbors and non-resident neighbors)—are encompassed in the priority system outlined in 5 RM § 17.11(A)(1)(c).

AR 190.

The 11/21/13 Stenvall Statement also justified the Service's rejection of formal and informal bidding, because of a concern that a bidder "may be unable to complete the project (due to illness, bankruptcy, or lack of necessary equipment or skill)."  AR 190.  It also rejected the use of a lottery or first-come, first-served selection process:

> [There is a] risk [that] the Refuge [will] not receiv[e] an appropriate share of crops if a new cooperator is incapable of farming to Refuge standards or unwilling to work within the substantial restrictions that we place on cooperative farmers.  Any new cooperator brings the risk of the unknown to the farming program, both in the ability of the farmer and their knowledge of the area.  In the experience of some refuge managers at the Mid-Columbia River National

Wildlife Refuge Complex, there is a significant risk of new cooperators failing
due to lack of knowledge, skill, equipment, or understanding of refuge goals and
constraints.

AR 191.

The Service considered the priority system to be successful, because farmer-cooperators
had a stake in the success of the program as a result of multi-year crop agreements and
"economic investment in irrigation infrastructure." AR 191.  On December 4, 2013, Mr. Hymas
responded that although he was not an incumbent farmer-cooperator, former landowner, or
tenant, he was a neighbor of the Refuges who had farmed in the Columbia Basin for over 50
years.  AR 209–10.

On January 17, 2014, the Project Leader issued another Statement ("1/17/14 Stenvall
Statement") to describe the selection process for the 2014 farming season.  AR 212–14.  Of the
six farmer-cooperators who participated in the 2013 cooperative farming program, two were
identified as having multi-year agreements, and therefore the Service did not need to consider
them in 2014.  AR 212.  Four other incumbent farmer-cooperators expressed an interest in
continuing to farm their respective fields in 2014.  AR 212–13.

On January 21, 2014, the Service notified the incumbent farmer-cooperators that they
were selected to participate in the 2014 program.  AR 213, 216–19.  Again, Mr. Hymas was not
selected.  AR 220.

On January 24, 2014, the court was informed that the Service completed all cooperative
farming agreements for the 2014 farming cycle, but did not select Mr. Hymas, so the court lifted
the stay.  On January 27, 2014, the Government filed an addendum to the Administrative Record
(AR 190–220).

On February 5, 2014, Plaintiff filed an Amended Complaint, alleging that the Service's
use of a non-competitive bidding process for the cooperative farming agreements violated the
CICA, 41 U.S.C. § 253(a) (now § 3301(a)) (Count I); the FGCAA, 31 U.S.C. §§ 6303 and 6305
(Count II); and was arbitrary, capricious, an abuse of discretion, and contrary to law (Count III).
Am. Compl. ¶¶ 65–78.  The Amended Complaint also requested that the court (1) enjoin the
Service from awarding cooperative farming contracts for the McNary and Umatilla National
Wildlife Refuges in the future based on the priority system and (2) declare that the 2013 and
2014 cooperative farming agreement procurement process was unlawful.  Am. Compl. ¶¶ 1–7.

On February 17, 2014, Plaintiff filed a Motion For Judgment On The Administrative
Record ("Pl. MJAR"), with an Appendix.  On March 7, 2014, the Government filed a Motion To
Dismiss, Cross-Motion For Judgment Upon The Administrative Record And Response To
Plaintiff's February 17, 2014 MJAR ("Gov't Mot."), together with the Declaration of Lamont
Glass, Refuge Manager.  On March 14, 2014, Plaintiff filed a Response to the March 7, 2014
Motion To Dismiss And Reply To The February 17, 2014 MJAR ("Pl. Resp.").  On March 24,
2014, the Government filed a Reply ("Gov't Reply").

On February 26, 2014, the Service issued Amendment 15 that retroactively reinstated the Refuge Manual, as of December 31, 2007:

1. This supersedes Amendment 14 of Director's Order No. 42 (March 25, 1992).

*   *   *

3. Section 5 is amended to extend the termination of the date [sic] indefinitely.

4. This amendment shall be effective as of December 31, 2007.

5. This amendment clarifies that the listed directives were not revoked on December 31, 2007; the listed directives are not revoked unless and until they become superseded by newer policy.  The development of the Fish and Wildlife Service Manual is ongoing and many of the listed directives, including 6 RM 4.8 and 5 RM 17.11, remain in effect.

Director's Order No. 42, Amend. 15 (Feb. 26, 2014).

On June 23, 2014, the Government filed, at the court's request, a Notice that included the cooperative farming agreements with farmer-cooperators Frederickson, Maddox, Peterson, and Strebin.  None of these cooperative farming agreements were included in the Administrative Record submitted and amended by the Government.  Each agreement was executed in March 2014 and had a five-year term.

On July 24, 2014, the Government filed a Notice that explained the circumstances regarding the Government's failure to file the aforementioned farming agreements until June 23, 2014.

## IV.   DISCUSSION.

### A.   The Government's Motion To Dismiss.

#### 1.   The Government's Argument.

The Government makes five principal arguments as to why the United States Court of Federal Claims does not have jurisdiction under 28 U.S.C. § 1491(b)(1) of the Tucker Act to review the Service's "use of cooperative agreements to promote wildlife conservation[.]"  Gov't Mot. 14.  First, the cooperative farming agreements are not "procurements," as that term is defined by the United States Court of Appeals for the Federal Circuit.  Gov't Mot. 14 (citing *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345–46 (Fed. Cir. 2008) (applying the definition of "procurement" as "acquiring property or services" found in 41 U.S.C. § 111 [formerly § 403] to 28 U.S.C. § 1491(b)(1)); *see also Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010) ("[Section] 1491(b)(1) in its entirety is exclusively concerned with procurement solicitations and contracts.")).

Second, the Government asserts that the FGCAA does not govern the cooperative farming agreements at issue, because 16 U.S.C. § 742(f) precludes application of the FGCAA to

the cooperative farming agreements at issue.  Gov't Mot. 16 (quoting 16 U.S.C. § 742f(d)(2)(A) (allowing the Service, "[n]otwithstanding [the FGCAA], . . . [to] enter into a cooperative agreement with a partner organization, academic institution, State or local government agency")).  Nevertheless, the Government views the FGCAA as a limitation on the court's jurisdiction, because the terms "procurement" in the Tucker Act and "procurement contract," as used in the FGCAA, are "co-extensive" for purposes of jurisdiction.  Gov't Reply 2.

The FGCAA provides:

An executive agency shall use a *procurement contract* . . . when—

> (1) the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; or

> (2) the agency decides in a specific instance that the use of a procurement contract is appropriate.

31 U.S.C. § 6303 (emphasis added).

An executive agency shall use a cooperative agreement . . . when—

> (1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and

> (2) substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.

31 U.S.C. § 6305.

The United States Court of Federal Claims has jurisdiction over procurement contracts, but not cooperative agreements.  Gov't Mot. 14–15 (citing 31 U.S.C. §§ 6303, 6305); *see also id.* (differentiating "procurements" from "cooperative agreements, which . . . have an entirely different status under Federal law"); *see also CMS Contract Mgmt. Servs., Inc. v. United States*, 110 Fed. Cl. 537, 552 (2013) (determining that "in light of the standards set forth in the FGCAA," the agreements at issue "are best classified as cooperative agreements rather than procurement contracts").[17]

---

[17] The Government notes that the court in that case "reach[ed] the correct conclusion," but erroneously "characterized its decision in terms of the merits rather than in terms of subject matter jurisdiction."  Gov't Mot. 16 n.6.  After briefing in this case concluded, however, the United States Court of Appeals for the Federal Circuit reversed the trial court in *CMS Contract*

The Government describes the Service's cooperative farming agreements as "classic examples of cooperative agreements," because they "'carry out a public purpose of support' for wildlife conservation:" their "'principal purpose'" is not to "'acquir[e] [farming] services for the direct benefit [of] or use'" by the Service.  Gov't Mot. 17 (quoting 31 U.S.C. §§ 6303, 6305). Instead, "migratory birds and wildlife plainly are the direct beneficiaries of these cooperative farming services," and the cooperative farming agreements have the principal purpose of transferring "a thing of value" to those intended recipients.  Gov't Mot. 16–18 (quoting 31 U.S.C. § 6305).

Third, the National Wildlife Refuge System Improvement Act, one of the Service's governing statutes, specifically authorizes the Service to "enter into a cooperative agreement" to conduct refuge projects.  *See* 16 U.S.C. § 742f(d)(2)(A).  The Government adds that 50 C.F.R. § 29.2 also allows the Service to enter into "[c]ooperative agreements with persons for crop cultivation . . . on wildlife refuge areas," as further evidence that the court does not have jurisdiction to adjudicate the claims alleged in the Amended Complaint.  Gov't Mot. 17. Therefore, the court must respect this explicit congressional choice to allow "the [Service] to use 'cooperative agreements,' rather than procurement contracts, to promote wildlife conservation." Gov't Mot. 17.

Fourth, the Government criticizes Plaintiff's reliance on *360Training.com, Inc. v. United States*, 104 Fed. Cl. 575 (2012), where the court exercised jurisdiction to determine whether an agency properly used a third party to provide a required service.  Gov't Reply 3.  The Government asserts that the analysis in *360Training.com* is flawed, because the "fact that the agency [in *360Training.com*] entered into cooperative agreements to pursue the mission of the agency does not lead to the conclusion that the agency was conducting a procurement; otherwise, all cooperative agreements would be procurement contracts[.]"  Gov't Reply 3.  Thus, whether or not the Service's governing statutes reflect a "statutory mandate" is irrelevant to the question of whether the United States Court of Federal Claims has jurisdiction to adjudicate the claims alleged in the February 5, 2014 Amended Complaint.  Gov't Reply. 3.

In the alternative, assuming that *360Training.com* is correctly decided, the Government rejects Plaintiff's argument that the cooperative farming agreements reflect a "statutory mandate," which, if true, would indicate the agreements at issue are "procurement contracts" over which the United States Court of Federal Claims may exercise jurisdiction.  Gov't Mot. 18 (citing Pl. MJAR 9 ("[W]here an agency has a statutory mandate to provide a service, and the agency decides to use a cooperative agreement to obtain the provision of that service, that agency has engaged in a procurement process . . . and the [United States Court of Federal Claims] has jurisdiction[.]" (quoting *360Training.com*, 104 Fed. Cl. at 577–78))).  In this case, it is true that the Service is required to "provide for the conservation of . . . wildlife," but the Service has discretion to choose how best to fulfill that statutory obligation.  Gov't Mot. 18 (quoting 16 U.S.C. § 668dd(a)(4)).  For this reason, the 2007 Comprehensive Conservation Plan for the McNary and Umatilla Refuges recognized that the purpose of the Refuges was "*compatible* with cooperative agreement farming," but the Plan did not mention any "statutory *mandate*," requiring

---

*Mgmt. Servs.*, and held that the disputed contracts were procurement contracts.  *See CMS Contract Mgmt. Servs. v. United States*, 745 F.3d 1379, 1386 (Fed. Cir. 2014).

the Service to engage in force-account farming (farming by agency personnel), as suggested by the Amended Complaint. Gov't Mot. 19 (emphases in original); *see also id.* (rejecting Plaintiff's argument that 16 U.S.C. § 668dd(e)(1)(E), requiring that Interior "shall manage [wildlife refuges] . . . in a manner consistent with [a comprehensive conservation] plan," reflects a statutory mandate).

Finally, the February 5, 2014 Amended Complaint challenges four 2013 cooperative farming agreements that expired on or about March 1, 2014. Gov't Mot. 20 (citing AR 1, 6, 11, 16; Am. Compl. at 12). But, these claims now are moot. Gov't Mot. 21 (citing *Rice Servs. Ltd. v. United States*, 405 F.3d 1017, 1020 n.3 (Fed. Cir. 2005) ("A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." (internal quotations omitted))). Therefore, the court may not issue a declaratory judgment that "would have no practical effect on the parties," and "be tantamount to issuing an advisory opinion." Gov't Mot. 21 (quoting *Labat-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 576 (2005)). "Notwithstanding the existence of an ongoing controversy regarding the multi-year 2013 [] and the 2014 [cooperative farming agreements], there no longer is a live controversy regarding the expired 2013 [cooperative farming agreements]." Gov't Mot. 21. Therefore, the Government insists this is not a case where potentially unlawful action is "capable of repetition, yet might again evade review." Gov't Reply 4–5 (quoting Pl. Resp. 6–7).

### 2. Plaintiff's Response.

Plaintiff responds that the cooperative farming agreements in this case were entered into "in connection with a procurement or a proposed procurement," because the Service is "acquiring property or [farming and maintenance] services" from the farmer-cooperators to feed "migratory waterfowl and other species[.]" Pl. Resp. 3–4.

Next, Plaintiff explains that the Government "conflates the jurisdictional question of whether [the Service] engaged in a procurement, within the meaning of the Tucker Act, 28 U.S.C. § 1491, with a merits question of whether [the Service] selected the proper legal instrument (*i.e.*, procurement contract, grant, or cooperative agreement) under the FGCAA." Pl. Resp. 2–3. For purposes of bid protest jurisdiction, the United States Court of Appeals for the Federal Circuit has defined "procurement" broadly: "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with a contract completion and closeout." Pl. Resp. 3 (quoting *Res. Conservation Grp.*, 597 F.3d at 1244 (internal quotations omitted)). For this reason, the United States Court of Federal Claims has "rejected the [G]overnment's invitation to adopt the FGCAA's narrower definition of 'procurement contract' for purposes of determining whether jurisdiction exists under the Tucker Act." Pl. Resp. 3 (citing *360Training.com*, 104 Fed. Cl. at 577 ("The [c]ourt finds that the definition [of procurement] set forth by the Federal Circuit is clear and it declines to adopt the extraneous limitations suggested by the Government.")). Consequently, the Government's reliance on the FGCAA's definition of "procurement contract" as a basis to limit the court's jurisdiction is misplaced. Pl. Resp. 5, 8. But, even viewing the cooperative farming agreements through the lens of the FGCAA leads to the same conclusion: they are procurement contracts, not cooperative agreements. Pl. MJAR 13–14 (citing 16 U.S.C. §§ 6303, 6305). The purpose of the "cooperative farming agreements" is to obtain farming services, maintenance services, and irrigation equipment for the benefit of wildlife. These activities constitute a

procurement, *i.e.*, "to acquire (by purchase, lease, or barter) property or services." Pl. MJAR 13–14 (quoting 31 U.S.C. § 6303). In this case, the cooperative farming agreements are not intended to support or provide assistance to farmers, which, if true, would require the use of cooperative agreements under the FGCAA. Pl. MJAR 14 (citing 31 U.S.C. § 6305; *360Training.com*, 104 Fed. Cl. at 580 ("[A] key inquiry [into the procurement/cooperative agreement distinction] is whether the agency's focus is on providing a service to the ultimate beneficiaries [*i.e.*, a procurement] or on assisting the intermediaries in providing a service [*i.e.*, a cooperative agreement].")).

The National Wildlife Refuge System Administration Act of 1966 requires that the Service manage the Refuges "for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats . . . for the benefit of present and future generations of Americans." Pl. Resp. 4 (quoting 16 U.S.C. § 668dd(a)(2)). That Act repeatedly uses the word "shall" to emphasize that the Service's primary responsibility is to conserve wildlife and wildlife habitat within the refuges. Pl. Resp. 4 (quoting 16 U.S.C. § 668dd(a)(3)(A) ("[E]ach refuge shall be managed to fulfill the mission of the [National Wildlife Refuge] System[.]"); *see also id.* § 668dd(a)(4)(A) ("[T]he Secretary shall . . . provide for the conservation of . . . wildlife . . . and their habitats within the [National Wildlife Refuge] System[.]")). To implement this mandate, the Service is required to administer each refuge, pursuant to a Comprehensive Conservation Plan. Pl. Resp. 4 (citing 16 U.S.C. § 668dd(e)(1)(E)). The McNary and Umatilla Refuge Plans require the Service to provide feed for migratory waterfowl. Pl. Resp. 4 (citing McNary & Umatilla CCP B-74 to B-75; C-65 to C-66). Through use of cooperative farming agreements, the Service elected to use farmer-cooperators, instead of Service staff, to accomplish this mandate. Pl. Resp. 4 (citing AR 43–84 (identifying three options for crop production within the Refuges)). The Service's mandate to provide crop feed is accomplished by procuring these services through a contractual instrument, and is part of "the process of acquiring property or services" for purposes of bid protest jurisdiction. Pl. Resp. 5. Therefore, "where an agency has a statutory mandate to provide a service, and the agency decides to use a cooperative agreement to obtain the provision of that service, that agency has engaged in a procurement process under the Tucker Act[.]" Pl. Resp. 4–5 (quoting *360Training.com*, 104 Fed. Cl. at 577–78); *see also id.* (arguing that obtaining migratory bird and wildlife feed services to grow crops by relying on private farmers necessarily entails the "need for property or services" (quoting *360Training.com*, 104 Fed. Cl. at 582)).

As to the Government's argument that Plaintiff's challenge to four 2013 cooperative farming agreements is moot, the Service has evidenced by its prior conduct that unlawful use of the priority system "is capable of repetition, yet might again evade review." Pl. Resp. 6–7 (quoting *Cal. Indus. Facilities Res., Inc. v. United States*, 100 Fed. Cl. 404, 409 (2011); *see also Valley Constr. Co. v. Marsh*, 714 F.2d 26, 28 (5th Cir. 1983) (applying the mootness exception to United States Army Corps of Engineers' minority set-aside contracts)). In addition, as the Administrative Record reflects, the Service clearly intends to continue the practice of providing preferences to incumbent farmer-cooperators to avoid competition. Pl. Resp. 7.

3.      The Court's Resolution.

a.      Subject Matter Jurisdiction.

The United States Court of Federal Claims has jurisdiction to adjudicate bid protests "in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  The United States Court of Appeals for the Federal Circuit has applied the definition of "procurement" from 41 U.S.C. § 111 (formerly 41 U.S.C. § 403(2)) to define the scope of the court's bid protest jurisdiction:

> "[P]rocurement" includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.

*Distributed Solutions,* 539 F.3d at 1345 (quoting 41 U.S.C. § 111); *accord Res. Conservation Grp.*, 597 F.3d at 1244  (quoting, with approval, § 111 and *Distributed Solutions*); *see also RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) (observing that the phrase "in connection with" in the Tucker Act is "very sweeping in scope").  The Service uses cooperative farming agreements to obtain the services of farmer-cooperators to feed migratory birds and wildlife on the Refuges.  In the court's judgment, that activity is a procurement.

This conclusion comports with the United States Court of Appeals for the Federal Circuit's decision in *CMS Contract Management Services*, where instead of directly paying landlords to subsidize rent for low-income families, the agency entered into Performance-Based Annual Contribution Contracts ("PBACCs") with Public Housing Agencies ("PHAs"),[18] that in turn contracted with local landlords.[19]  *Id.* at 1381–83.  Potential bidders filed suit when the agency decided to re-issue the PBACCs as cooperative agreements, instead of conducting a competitive procurement.  *Id.* at 1383.  The appellate court determined that the intended beneficiaries of the PBACCs were the low-income families; the PHAs and landlords were intermediaries.  *Id.* at 1386.  Therefore, the agreements were used to obtain services from third-parties, not to provide assistance to them.  In this case, the intended beneficiaries are the migratory birds and wildlife on the refuges.  The farmer-cooperators are intermediaries.  The Administrative Record demonstrates that the Service contracted with farmer-cooperators, not to

---

[18] A Public Housing Agency is a "State, county, municipality, or other governmental entity or public body . . . authorized to engage in or assist in the development or operation of public housing."  *CMS Contract Mgmt. Servs.*, 745 F.3d at 1382 (quoting 42 U.S.C. § 1437a(b)(6)(A)).

[19] Although the appellate court did not explicitly address the jurisdiction of the United States Court of Federal Claims in *CMS Contract Management Services*, the decision reflects an implicit affirmation of the court's jurisdiction.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it." (internal citations and quotations omitted)).

benefit them financially, but to obtain their services to provide food for migratory birds and wildlife, in exchange for the farmers' personal use of public-owned lands.   AR 46–47 (identifying only benefits to waterfowl in the list of justifications for the McNary Refuge farming program); AR 63 (same re: Umatilla Refuge); *see also* 16 U.S.C. § 668dd(a)(2) ("The mission of the [Refuge] System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration, of the fish, wildlife, and plant resources and their habitats within the United States[.]").   The fact that farmer-cooperators may profit from this arrangement does not change their status as intermediaries.[20]   As such, the cooperative farming agreements in this case are procurements, subject to the Tucker Act.

The United States Court of Federal Claims also has rejected the Government's invitation to narrow the court's bid protest jurisdiction based on the procurement/cooperative agreement dichotomy in the FGCAA.  *See 360Training.com*, 104 Fed. Cl. at 587 ("Although the parties devoted a substantial part of their briefs to the FGCAA, that Act is mostly irrelevant to this [c]ourt's jurisdiction under § 1491(b)(1).").[21]   Instead of looking to the FGCAA, the court's jurisdictional inquiry should focus on the definition of procurement in the CICA, 41 U.S.C. § 111.  *Id.* at 587; *see also id.* at 583–84 (determining that "cooperative agreements," issued by OSHA to provide online training programs for employers and employees, were procurements and that the court had jurisdiction to adjudicate the merits of the protest); *id.* at 585 (rejecting the Government's focus on the FGCAA, and concluding that, "[w]hatever the agreements are called, . . . [the agency] was using the agreements to obtain the services of third parties").

As for the Government's argument that 50 C.F.R. § 29.2 exempts the cooperative farming agreements in this case from the court's Tucker Act jurisdiction, to the extent the Government is arguing that this regulation should be afforded deference per *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Government is mistaken.  *See B & H Med., LLC v. United States*, __ Fed. Cl. __, 2014 WL 2854090, at *6 (June 23, 2014) ("[N]umerous circuit courts have considered whether *Chevron* deference is due to an agency regulation interpreting a statutory judicial review provision, and have found uniformly

---

[20] In addition, in *CMS Contract Management Services*, the agency elected to utilize intermediaries, instead of staff resources, for budgetary reasons.  *See* 745 F.3d at 1385.  The Service in this case also selected the option with the least budgetary impact.  AR 49–50, 68–69, 190–93.

[21] The Government cited *360Training.com* for the proposition that the court must "'turn[] to the statutory structure of the FGCAA' . . . for purposes of bid protest jurisdiction."  Gov't Mot. 16 (quoting *360Training.com,* 104 Fed. Cl. at 579).  The Government's citation, however, is misleading, because that section of the *360Training.com* opinion is devoted only to describing the statutory structure of the FGCAA to understand the parties' arguments.  *See 360Training.com*, 104 Fed Cl. at 579 ("As a threshold matter, the [c]ourt turns to the statutory structure of the FGCAA . . . .  The parties' arguments are heavily influenced by their interpretation of the FGCAA[.]").  Then, the court goes on to reject "the Government's invitation to needlessly graft extraneous limitations [*i.e.*, the FGCAA] onto the Tucker Act," determining the FGCAA to be "mostly irrelevant to this [c]ourt's jurisdiction."  *Id.* at 586–87.

that no *Chevron* deference is given because the task of determining a federal court's jurisdiction falls to the court, not an agency.").

For these reasons, the court has determined that it has jurisdiction under the Tucker Act to adjudicate the claims alleged in the Amended Complaint, because the Service engaged in a "process for determining the need for property or services" to comply with a congressional mandate to feed refuge wildlife. *See Distributed Solutions*, 539 F.3d at 1346; *see also id.* ("To establish jurisdiction . . . , the contractors must demonstrate that the [G]overnment at least initiated a procurement, or initiated 'the process for determining a need' for acquisition[.]" (quoting 41 U.S.C. § 111)).[22]

### b.    Standing.

The plaintiff must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1) to contest the award of a federal contract. *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue."). To determine whether a protester is an "interested party," the United States Court of Appeals for the Federal Circuit has articulated a two-part test: "(1) [the protestor] was an actual or prospective bidder or offeror, and (2) [the protestor] had a direct economic interest in the procurement or proposed procurement." *Distributed Solutions*, 539 F.3d at 1344. In a post-award protest, the plaintiff also must establish it had a "substantial chance" of receiving the contract. *See Digitalis Educ. Solutions, Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (citing *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006) ("To prove a direct economic interest as a putative prospective bidder, [plaintiff] is required to establish that it had a substantial chance of receiving the contract." (internal quotation omitted))). In addition, the protestor must establish that the alleged errors in the procurement were prejudicial. *See Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1315–16 (Fed. Cir. 2011) (requiring a bid protestor to show prejudice where the alleged violations do not involve "fundamental procedural rights").

In this case, the Government does not contest that Mr. Hymas is an "interested party." Pl. MJAR 10 (citing 28 U.S.C. § 1491(b)(1); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (adopting the Competition in Contract Act's definition of "interested party")). The court also is satisfied that Mr. Hymas's attempts to bid or otherwise participate in the cooperative farming program for 2013 and 2014 evidence that he had a direct economic interest that was affected adversely by the Service's decision to award cooperative farming agreements based on a priority system. *See Distributed Solutions*, 539 F.3d at 1344 (requiring the protestor to have a "direct economic interest in the procurement"). In addition, given Mr. Hymas's long experience as a farmer, he had a substantial chance of securing a cooperative farming agreement, but for the Service's use of a priority selection system. AR 209 (detailing Mr. Hymas's past farming experience); *see also Labbatt Food Serv. Inc. v. United States*, 577

---

[22] In addition, the Service's Cooperative Farming Selection Process, implementing a priority system, without the use of competitive procedures, violated agency regulatory authority and is subject to judicial review. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006) (holding that agency guidance that constitutes a *de facto* rule or binding norm is "subject to judicial review").

F.3d 1375, 1378 (Fed. Cir. 2009) (holding that prejudice is demonstrated where the protestor "can show that *but for the error*, it would have had a substantial chance of securing the contract" (emphasis added)).

For these reasons, the court has determined that Mr. Hymas has standing to seek an adjudication of the claims alleged in the Amended Complaint in the United States Court of Federal Claims.

### c.      Mootness.

The court also rejects the Government's argument that Mr. Hymas's challenges to the 2013 cooperative farming agreements are moot. *See* Gov't Mot. 21. *But see* Gov't Reply 4–5 (arguing the 2014 claims are not moot). "A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000). Mr. Hymas requested injunctive relief in April 2013 and again in July 2013. In response, the court agreed to a stay of proceedings, if the Service would consider Mr. Hymas for the 2014 farming cycle. *See* Dkt. 18 ("Government's counsel advised the court that, as part of the process for selecting cooperators for the 2014 farming cycle, the [Service] will hold informal discussions with potential cooperators between September and November, 2013. . . . Mr. Hymas would be contacted during that time regarding his candidacy for a cooperative farming agreement for the 2014 season."). The Service's agreement to consider Mr. Hymas as a farmer-cooperator for the 2014 cycle, however, does not moot his claims as to the 2013 cycle. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.").

On March 20, 2014, the Service also entered into four cooperative farming agreements with incumbent farmer-cooperators, again based on a priority system. This evidences a likelihood of repeat unlawful conduct. *See Cal. Indus. Facilities Res.*, 100 Fed. Cl. at 409 ("A notable exception to the mootness doctrine occurs when the action complained of is capable of repetition, yet might again evade review."). In addition, each of these agreements had a five-year term. Dkt. No. 41. Prior to this bid protest, however, it appears that the Service never entered into five-year term arrangements; in fact, a one-year term appears to have been the norm.[23] AR 1, 6, 11, 16. Moreover, the Government did not provide these contracts to the court until June 23, 2014—after the court ascertained they were never submitted to supplement the Administrative Record, as required by RCFC 37(c).[24]

---

[23] The Umatilla and McNary Plans indicated that the cooperative farming agreements should have three-year terms. AR 52, 73. Nevertheless, of the six agreements in the Administrative Record, only one had a three-year term. AR 26 (Blasdel). Another had a four-year term. AR 21 (Pierce). The other four had one-year terms. AR 1, 6, 11, 16.

[24] RCFC 37(c)(1) provides:

For these reasons, the Government's March 7, 2014 Motion To Dismiss is denied.

**B.    Plaintiff's Motion For Judgment On The Administrative Record And The Government's Response And Cross-Motion.**

**1.    Plaintiff's Argument.**

As to the merits, Mr. Hymas proffers six arguments to support his Motion For Judgment On The Administrative Record.  First, the Service's award of cooperative farming agreements, based on the Cooperative Farming Selection Process's "Priority System," instead of full and open competition, violates the CICA.  Pl. MJAR 13.

Second, although the Government represents that Congress enacted several statutes that exempt the Service's priority system from the CICA, none does so.  Pl. MJAR 10 ("Neither [16 U.S.C. § 664 nor 16 U.S.C. § 742f] authorizes [the Service] to enter into the [cooperative farming agreements] at issue in this case.").  Section 664 provides that the Secretary of the Interior may use cooperative agreements, but only in accordance with the provisions of 16 U.S.C. § 661.[25]  Pl. MJAR 10.  Section 661, in turn, authorizes cooperative agreements "to

---

Failure to Disclose or Supplement.  If a party fails to provide information or identify a witness as required by RCFC 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

    (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

    (B) [not used]; and

    (C) may impose other appropriate sanctions, including any of the orders listed in RCFC 37(b)(2)(A)(i)–(vi).

RCFC 37(c)(1).

[25] Section 661 provides:

For the purpose of recognizing the vital contribution of our wildlife resources to the Nation . . . and to provide that wildlife conservation shall receive equal consideration and be coordinated with other features of water-resource development programs . . . for the purposes of sections 661 to 666c of this title . . . , the Secretary of the Interior is authorized

    (1) to provide assistance to, and cooperate with, Federal, State, and public or private agencies and organizations in the development, protection, rearing, and stocking of all species of wildlife, resources thereof, and their habitat . . . ;

provide assistance to, and cooperate with, Federal, State, and public or private agencies and organizations." Pl. MJAR 11. Therefore, the Service's statutory authority is limited by 16 U.S.C. § 661 to agreements with the enumerated entities, not private individuals. Pl. MJAR 11. In addition, in attempting to relate the purpose of subsection 742f(d) to refuge farming, the Government misquotes and mischaracterizes 16 U.S.C. § 742f(d)(2). Pl. Resp. 11–12 (citing Gov't Mot. 29); *see also id.* at 11 ("[The Government's] argument intentionally conflates the 'purposes' referenced [in] § 742f(d)(2)(A), *i.e.*, the purposes of the National Wildlife Refuge System Volunteer and Community Partnership Act of 1998, Pub. L. 105-242, § 2, Oct. 5, 1998, 112 Stat. 1574, with the 'projects and programs' that § 742f(d)(2)(B) authorizes the Secretary to approve."). In fact, the cooperative agreements referenced in section 742f(d)[26] do not relate to refuge farming at all. Pl. MJAR 11–12 (citing 16 U.S.C. § 742f(d)).

---

    (2) to make surveys and investigations of the wildlife of the public domain . . . ; and

    (3) to accept donations of land and contributions of funds in furtherance of the purposes of said sections.

16 U.S.C. § 661.

    Section 664 provides:

    Such areas as are made available to the Secretary of the Interior . . . shall be administered by him directly or in accordance with cooperative agreements entered into pursuant to the provisions of section 661 of this title and in accordance with such rules and regulations for the conservation, maintenance, and management of wildlife, resources thereof, and its habitat thereon[.]

16 U.S.C. § 664.

    [26] Section 742f(d), as amended in 2004, provides:

    Notwithstanding chapter 63 of Title 31, the Secretary of the Interior may negotiate and enter into a cooperative agreement with a partner organization, academic institution, State or local government agency, or other person to implement one or more projects or programs for a refuge or complex of geographically related refuges in accordance with the purposes of this subsection and in compliance with the policies of other relevant authorities, regulations, and policy guidance.

16 U.S.C. § 742f(d)(2)(A).

    The purposes of subsection 742f(d) are:

    (1) to encourage the use of volunteers to assist the United States Fish and Wildlife Service in the management of refuges within the System;

Third, the Service also violated the FGCAA.  Pl. MJAR 13 ("Even if [the Service] was authorized to enter into cooperative agreements, [the Service's] selection of cooperative agreements as the proper legal instrument to procure farming and maintenance services and irrigation equipment violated the FGCAA" and was improper.).  The cooperative farming agreements at issue fall within the FGCAA's definition of a procurement contract.  Pl. MJAR 13–14 (citing 16 U.S.C. § 6303, 6305).  That is so, because the Service used the cooperative farming agreements to provide feed for migratory birds and wildlife, not to assist farmers.  As such, the farmer-cooperators are intermediaries and the Service engaged in a procurement.  Pl. MJAR 14 (citing *360Training.com*, 104 Fed. Cl. at 580 ("An agency is acquiring the intermediary's services for its own direct benefit or use if the agency otherwise would have to use its own staff to provide the beneficiaries the services offered by the intermediary. . . .  However, an agency is obtaining services for a public purpose if the agency is charged with providing support or assistance to intermediaries as opposed to the final beneficiaries. . . .  Thus, a key inquiry is whether the agency's focus is on providing a service to the ultimate beneficiaries or on assisting the intermediaries in providing a service.")).  In addition, the cooperative farming agreements fulfill a statutory mandate to conserve wildlife.  As such, the agreements by which this is accomplished are procurements.  Pl. Resp. 3–4 (citing *360Training.com*, 104 Fed. Cl. at 577–78 ("[W]here an agency has a statutory mandate to provide a service, and the agency decides to use a cooperative agreement . . . , that agency has engaged in a procurement process under the Tucker Act[.]").

Fourth, as to the Government's contention that 50 C.F.R. § 29.2 interprets the terms "agencies and organizations," as used in 16 U.S.C. § 661, to include individuals, that interpretation is implausible.  Pl. Resp. 8–9.  To the extent that the Government insists that 16 U.S.C. § 668dd(h)[27] somehow "ratifi[ed]" 50 C.F.R. § 29.2, to allow the Service to execute "[c]ooperative agreements with persons for crop cultivation . . . on wildlife refuge[s]," the Government is incorrect.  Gov't Mot. 26–27.  In fact, 16 U.S.C. § 668dd(h) did not incorporate 50 C.F.R. § 29.2 into any statute and, in any event, cannot be interpreted to circumvent the CICA, without specific statutory authority.  Pl. MJAR 12–13 (citing 1996 U.S.S.C.A.N. 3342, 3349 ("Subsection (g) [now § 668dd(h)] is a technical provision which continues the regulations now applicable to the various areas of the system[.]")).

---

(2) to facilitate partnerships between the System and non-Federal entities to promote public awareness of the resources of the System and public participation in the conservation of those resources; and

(3) to encourage donations and other contributions by persons and organizations to the System.

National Wildlife Refuge System Volunteer and Community Partnership Enhancement Act of 1998, Pub. L. 105-242, § 2(b), 112 Stat. 1574 (Oct. 5, 1998).

[27] Section 668dd(h) states: "Regulations applicable to areas of the [National Wildlife Refuge] System that are in effect on October 15, 1966, shall continue in effect until modified or rescinded."  16 U.S.C. § 668dd(h).

Fifth, the priority system used by the Service to select farmer-cooperators does not comply either with the Departmental Manual or the Service Manual. Pl. MJAR 15–16; Pl. Resp. 14. The competitive requirements contained in the Departmental Manual have never been waived for the Service. Pl. MJAR 16 (citing 505 DM § 2.13 (2008) ("Competition in making awards through cooperative agreements is strongly encouraged and is expected in awarding discretionary grants[.]")). And, although the Service Manual effectively replaced the Refuge Manual, the former never authorized the Service to use a priority system. Pl. MJAR 16 (citing 516 FW § 6 (2014) ("Issuing Discretionary Grant and Cooperative Agreement Awards without Competition.")). Instead, the Service Manual "encourage[d] competition when making . . . cooperative agreement awards," allowing for single source awards only when one or more specific criteria, not applicable here, are met. *See* 516 FW § 6.7 (2014).[28] In this case, the Service made no attempt to comply with the Service Manual's competitive requirements. Pl. MJAR 16 (citing 516 FW § 6 (2014) (listing exceptions to competition for cooperative agreements)). Moreover, the February 26, 2014 Amendment to Director's Order No. 42 of the Service Manual constituted an unlawful attempt retroactively to modify Director's Order No. 42—to justify the Service's arbitrary, capricious, and irrational conduct in this case. Pl. Resp. 15–16.

Sixth, assuming *arguendo* that the Refuge Manual was not revoked, the Service's actions regarding Mr. Hymas's request to be considered as a farmer-cooperator for the 2013 and 2014 farming seasons were arbitrary, capricious, and lacked a rational basis. Pl. MJAR 17. As an initial matter, the Service's permittee selection process was neither competitive nor equitable, as required by 5 RM § 17.11(A)(1) (1986),[29] nor did the Service explain how a priority system was

---

[28] Section 6.7 of the Service Manual states that "[the Service] must encourage competition when making grant and cooperative agreement awards, but [it] may issue single source awards when at least one of the criteria in Table 6-3 is met[.]" 516 FW § 6.7(A) (2014). Table 6-3 identifies the following criteria: (1) unsolicited proposal; (2) continuation of a presently funded activity that would be adversely affected by competition; (3) legislative intent; (4) unique qualifications of the applicant; and (5) emergencies. 516 FW § 6.7 tbl. 6-3 (2014) (cross-referencing 505 DM § 2); *see also* 516 FW § 6.4 (2014). Of course, the Service did not identify the program at issue in this case as one that could be satisfied by one farmer-cooperator.

[29] Section 17.11(A)(1) of the Refuge Manual states, in pertinent part:

Where the available space, time, or resource is limited, thereby limiting the capacity for accommodating the number of individuals pursuing compatible economic uses, a permittee selection process must be used to equitably limit the number of permittees. One of the following systems should be used as a selection process.

(a) Competitive bids. . . .

(b) Other equitable process. . . .

(c) Priority system. . . . Generally, use of one of the above-described processes is preferable to a priority system. However, in those instances where a priority

"more appropriate to [the] program needs than competitive bidding."  Pl. MJAR 17 (quoting 5 RM § 17.11(A)(1)(c) (1986)); *see also* AR 87–92 (describing the 2013 selection process). Therefore, the Service's use of a priority system was arbitrary and capricious.  In addition, the 4/29/13 Stenvall and 4/29/13 Glass Statements are the Service's *post-hoc* attempt to satisfy the Administrative Procedure Act ("APA"), but are insufficient to satisfy the rational basis requirement of the APA.  Pl. MJAR 17 (citing *D & S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 35 n.11 (2011) ("[A]llowing [a *post-hoc* rationalization] to act as a gap filler . . . would frustrate effective judicial review under the APA standards." (quoting *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 377 (2010)))).

Mr. Hymas also contends that as for the 2014 farming season, the Service's decision to reject him as a farmer-cooperator was arbitrary, capricious, and lacked a rational basis.  Pl. MJAR 18.  The Refuge Manual did not authorize the Service to expand an incumbent farmer-cooperator's agreement to include additional cropland, without a competitive selection process. Pl. MJAR 17 (citing AR 26–28; 5 RM 17.11(A)(1)(c) (1986)).[30]  As such, the cooperative farming agreements that expanded the scope of the public land being used in 2014 were unlawful.  Pl. MJAR 8, 18 (citing AR 26–28).  In addition, the Service unlawfully used cooperative farming agreements to obtain remediation services in exchange for increased crop share.  Pl. MJAR 17 (citing AR 28).  The Refuge Manual states, "[f]rom a strictly legal standpoint, . . . . [a]n example of a questionable practice would be an increased crop share division to a farming cooperator in return for road maintenance or building maintenance not directly related to the specific farming activity covered by that permit."  Pl. MJAR 17–18 (citing

---

system is more appropriate to program needs, selection of participants may be made in the following order of priority.

(1) Previous permittees or cooperators. . . .

(2) Former landowners. . . .

(3) Former tenants. . . .

(4) Resident neighbors. . . .

(5) Non-resident neighbors. . . .

(6) Applicants from outside the local vicinity. . . .

5 RM § 17.11(A)(1) (1986).

[30] 5 RM § 17.11(A)(1)(c)(1) states: "Previous permitees or cooperators shall have priority over all other applicants for the *renewal* of any privilege[.]"  (emphasis added).  According to Plaintiff, this section of the Refuge Manual therefore allows only "renewal," not expansion of a privilege.  Pl. MJAR 17.

5 RM § 17.9 (1986)).[31]   But, that is exactly what happened with several of the farmer-cooperators in this case.   Moreover, although the 11/21/13 Stenvall Statement set forth the Service's reasons to justify the continued use of the priority system in 2014, it did

> not identify any evidence supporting the conclusion that past experience in the cooperative farming program, experience using the parcel of land to be farmed, or experience using land in the local vicinity are material to a cooperator's capability to perform.   [The 11/21/13 Stenvall Statement] does not identify any aspect of the cooperative farming program that is difficult to comply with, nor does [the Statement] identify any aspect of the parcels in the program that make successful farming difficult.

Pl. MJAR 18–19.

In addition, although the 11/21/13 Stenvall Statement identified an unspecified risk that potential farmer-cooperators could fail to complete the project, "due to illness, bankruptcy, or lack of necessary equipment or skill," the Service made no inquiry nor provided any explanation as to how a priority system alleviates any of these hypothetical risks.   Pl. MJAR 19.   In fact, the Service has no experience with new farmer-cooperators, since "the parcels at issue have been farmed—apparently without competition—by the same cooperators for 36 years (AR 206), 40 years (AR 207), and 20 years (AR 208)."   Pl. MJAR 19.   To the extent that the Service needs to

---

[31] Release R-007 of section 17.9 of the Refuge Manual provides:

> By their very nature, refuge economic use programs are fraught with administrative uncertainties.   In an effort to "get the job done" refuge managers have employed many innovative approaches when dealing with private individuals who do things on refuge lands.

> From a strictly legal standpoint, most current practices are appropriate, some are questionable and a few may have been simply unlawful.

> \* \* \*

> Congress, through appropriate channels, tells you how much you will have available to run your operation.   You cannot supplement these funds, no matter how great the need or how noble the cause, by selling or bartering things in the private sector and adding the proceeds to your budget.   It's unlawful.

> Examples would be selling or "banking" surplus grain at a grain elevator and then having the elevator pay some of your bills or provide some other goods or services.   Another example would be "banking" surplus or excess equipment with a private firm and then withdrawing different but supposedly equal-value items. A related example would be to acquire excess property with no intent to use it for any purpose other than trading stock.

17 RM § 17.9 (1986) (reprinted at AR 175).

provide an economic incentive for farmers to grow crops to feed migratory birds and wildlife, the use of reasonable multi-year agreements, not the priority system, provides that incentive, as the Service has recognized. Pl. MJAR 19–20 (citing 6 RM 4.8(A)(1) (1985) ("[C]ooperative farming agreements normally will be multi-year agreements.")).

## 2.    The Government's Response And Cross-Motion.

The Government's principal response was to repeat its jurisdictional argument that the cooperative farming agreements in this case are not procurement contracts and are exempt from the CICA. Gov't Mot. 31. In the same vein, the Service is not subject to the FGCAA. Gov't Mot. 30 (citing 16 U.S.C. § 742f(d)(2)(A) (authorizing the Service to enter into cooperative agreements "notwithstanding [the FGCAA]")). The cooperative farming agreements are not procurement contracts under the FGCAA, because they are not used to "acquire" farming "services for the direct benefit or use" of the Service. Gov't Mot. 30–31. Instead, the Service is "providing assistance" to farmer-cooperators, by granting them "the right to farm refuge land" and making available "farming food for wildlife." Gov't Mot. 30–31 (citing 31 U.S.C. § 6303). The Government's Reply Brief, however, also argued that a procurement under the Federal Acquisition Regulation ("FAR") requires use of "appropriated amounts." Gov't Reply 8 (quoting 41 U.S.C. § 131 (defining "acquisition" as "the process of acquiring, with appropriated amounts, by contract for purchase or lease, property or services . . . that support the mission and goals of an executive agency"); *see also* 48 C.F.R. § 2.101(b)(2) (defining "acquisition," and referring to the use of "appropriated funds"); 48 C.F.R. § 2.101(b)(2) (further defining "procurement" as an "acquisition")).

Second, the Government posits that three statutes authorize the Service to use cooperative agreements, instead of procurement contracts, when engaging farmer-cooperators. The first statute, the 1958 Fish and Wildlife Coordination Act (16 U.S.C. §§ 661, 664), authorizes the Service to use cooperative agreements "[f]or the purpose of . . . wildlife conservation . . . , [and to] cooperate with Federal, State, and public or private agencies and organizations." Gov't Mot. 25 (quoting 16 U.S.C. § 661). The second statute, the National Wildlife Refuge System Administration Act of 1966 (16 U.S.C. § 668dd), implicitly ratified the Service's 1960 regulations, which provided for "[c]ooperative agreements with persons for [farming] . . . on wildlife refuge areas[.]" Gov't Mot. 17, 26–27 (quoting 50 C.F.R § 29.2). The third statute, the subsequent enactment of the National Wildlife Refuge System Volunteer and Community Partnership Enhancement Act of 1998, as amended in 2004, also shows that Congress approved of the Service's use of cooperative farming agreements: "Notwithstanding [the FGCAA] . . . the Secretary of the Interior may negotiate and enter into a cooperative agreement with a partner organization, academic institution, State or local government agency, or other person to implement one or more projects or programs for a refuge[.]" Gov't Mot. 28 (quoting 16 U.S.C. § 742f(d)(2)(A)). In fact, the purpose of section 742f(d)(2) is to "promote the stewardship of resources of the refuge through habitat maintenance, restoration, and improvement" and "support the operation and maintenance of the refuge." Gov't Mot. 28 (quoting 16 U.S.C. § 742f(d)(2)(B)). Plaintiff's argument—that cooperative farming agreements do not serve the purpose of the *entire* 1998 Act—overlooks the enumerated purposes of the subsection at issue. Gov't Mot. 29. The general purposes of the 1998 Act are served, as the cooperative farming agreements "encourage . . . other contributions by persons and organizations to the System," *i.e.*, farming labor, and promote "public participation in the conservation of [wildlife]

resources." Pub. L. 105-242, § 2.  In sum, these statutes evidence that Congress authorized the use of cooperative farming agreements and exempted the Service from the CICA.  Gov't Mot. 29.

Third, Section 661 authorizes the Service to use cooperative agreements to coordinate wildlife management with "public or private agencies or organizations."  16 U.S.C. § 661.  The dictionary definitions of "private" and "agency," both reference "person."  Gov't Mot. 25–26 (citing MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 988 (11th ed. 2005) (defining "private" as "concerning an individual person, company, or interest"); *see also id.* at 24 (defining "agency" as "a person or thing through which power is exerted or an end is achieved" or "an establishment engaged in doing business for another")).  These competing definitions establish that the statutory language is ambiguous, requiring agency interpretation.  Gov't Mot. 23–24 (citing *Chevron*, 467 U.S. 837); Gov't Mot. 26 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1320–21 (Fed. Cir. 2003) ("The existence of alternative dictionary definitions of a term, or the failure of dictionary definitions to provide a plain and unambiguous meaning of statutory language, indicates that the statute is open to interpretation.")).  By promulgating 50 C.F.R. § 29.2, the Service has interpreted the phrase "public or private agencies or organizations" to include "any person,"[32] so that "[c]ooperative agreements [may be entered into] with *persons* for crop cultivation . . . on wildlife refuge areas[.]"  Gov't Mot. 26 (quoting 50 C.F.R. § 29.2) (emphasis added).  Accordingly, the court must defer to the Service's "reasonable interpretation" of the undefined and ambiguous phrase, "private agencies and organizations," contained in 16 U.S.C. § 661, to include persons with whom the Service may enter into cooperative agreements, pursuant to 50 C.F.R. § 29.2.  Gov't Mot. 26–27; Gov't Reply 6.

Fourth, the Service's reliance on the Refuge Manual's reference to a priority system to select farmer-cooperators in 2013 and 2014 was lawful.  Gov't Mot. 31.  Contrary to Plaintiff's assertion, the Refuge Manual remains in effect.  Gov't Mot. 31–33.  Amendment 15 to Director's Order No. 42 retroactively "clarif[ied] that the effective date of revocation [of the Refuge Manual] had been postponed 'indefinitely.'"  Gov't Mot. 32 (quoting Director's Order No. 42 Amend. 15 (Feb. 26, 2014)).  Moreover, the Service followed the Refuge Manual in using a priority system to award cooperative farming agreements.  Gov't Mot. 35–36 (citing 5 RM § 17.11(A)(1)(c) (1986) (discussing cropland management in the context of the priority system)).  And, as the 4/29/13 Stenvall Statement explains, the Service chose the priority system as "most appropriate" for the program.  Gov't Mot. 36–38 (citing AR 190–92; *see also Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.")).  The Service also elected to use a priority system, because it provided "the lowest exposure to risk." Gov't Mot. 38 (quoting AR 191).  "The question of how best to accomplish the agency's mission and manage the risk of failure squarely falls within the agency's administrative expertise."  Gov't Mot. 39.

---

[32] The Service's regulations define "person" as "an individual, club, association, partnership, corporation, or private or public body."  Gov't Mot. 26 (quoting 50 C.F.R. § 1.6 (emphasis added)).

Likewise, the Service had a rational basis for selecting other farmer-cooperators for the 2013 farming season, instead of Mr. Hymas, as the 2013 Stenvall and Glass Statements reflect. Gov't Mot. 40–41. The Administrative Record shows that the farmer-cooperators selected had a successful history of farming refuge land; Mr. Hymas did not have that type of experience. Gov't Mot. 39–40 (citing AR 6–25, 26–42, 87–92). Therefore, the 2013 selection process was conducted in a manner "consistent with agency guidelines that give priority to 'previous cooperators,'" which "squarely fall within the agency's technical expertise." Gov't Mot. 40 (quoting 5 RM § 17.11(A)(1)(c) (1986)). For this reason, the Refuge Manual specifically provides that priority be given to neighbors within the local vicinity. Gov't Mot. 41 (citing 5 RM § 17.11(A)(1)(c) (1986)).

The Service also had a rational basis for selecting incumbent farmer-cooperators for the 2014 farming season, instead of Mr. Hymas, because he did not have priority status and all of those selected were incumbents, and one was also a former landowner. Gov't Mot. 44 (citing AR 212–15).

Therefore, Mr. Hymas cannot show "a clear and prejudicial violation of applicable statutes or regulations." Gov't Mot. 42 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001)).

### 3.    The Court's Resolution.

#### a.    Standard Of Review.

The United States Court of Federal Claims may grant a motion for judgment on the Administrative Record, pursuant to Rule 52.1 of the Rules of the Court of Federal Claims. The existence of a genuine issue of material fact does not require the court to conduct an evidentiary proceeding, nor prohibit the court from adjudicating that motion. *See Bannum v. United States,* 404 F.3d 1346, 1353–54 (2005) ("RCFC [52.1] requires the [United States] Court of Federal Claims, when making a prejudice analysis in the first instance, to make factual findings from the record evidence as if it were conducting a trial on the record."); *see also Meidl v. United States*, 114 Fed. Cl. 607, 613 (2014) ("The standard for judgment on the administrative record, pursuant to RCFC 52.1, is whether the plaintiff has met the burden of proof to show that the decision was without a rational basis or not in accordance with the law, given all the disputed and undisputed facts in the administrative record.").

The Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), authorizes the court to adjudicate challenges to agency decisions, under the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *see also Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.'" (citations omitted)); *see also Weeks Marine*, 575 F.3d at 1358 (same). An agency's decision to award a contract may be set aside if there has been a violation of law, regulation, or procedure, but "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009).

In addition, "[c]ourts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus. Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (*quoting Motor Vehicle Manufacturer's Assoc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). This rule recognizes a zone of acceptable results in each particular case and requires that the final decision evidence that the agency "considered the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105 (1983); *see also Weeks Marine*, 575 F.3d at 1368–69 ("We have stated that procurement decisions invoke highly deferential rational basis review . . . . Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors." (internal quotation marks and citations omitted)).

The United States Court of Appeals for the Federal Circuit also has held that when an award decision is challenged for lacking a rational basis, the trial court "must sustain an agency action[,] unless the action does not evince rational reasoning and consideration of relevant factors." *Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (internal alterations, quotation marks, and citations omitted); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (holding that the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis").

### b.   Whether The Service's Priority Selection System Violates The Competition In Contracting Act.

The CICA provides:

Except as provided in sections 3303, 3304(a), and 3305 of this title and except in the case of procurement procedures otherwise expressly authorized by statute, an executive agency in conducting a procurement for *property or services* shall—

(1)   obtain full and open competition through the use of competitive procedures in accordance with the requirements of this division and the Federal Acquisition Regulation; and

(2)   use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

41 U.S.C. § 3301(a) (emphasis added). "Procurement" is defined by Congress to include "all stages of the process of acquiring *property or services*." 41 U.S.C. § 111 (emphasis added).[33]  In this case, the Service is acquiring the services of the farmer-cooperators to feed migratory birds and wildlife in the refuges. As such, the Service is acquiring "property or services" for purposes of the CICA.

The Service, however, did not conduct "full and open competition through the use of competitive procedures." AR 93 (noting that the Service did not solicit bids for the 2013 program and that the Service simply "continue[s] to utilize existing cooperators [indefinitely] . . . unless there is a problem with their performance"); AR 190 (citing 5 RM § 17.11(A)(1)(C)). Nor did the Service "use the competitive procedure or combination [thereof] best suited under the circumstances." Therefore, the court has determined that the Service's Cooperative Farming Selection Process's priority system violated the CICA.

The Government counters that the CICA does not apply to the Service's award of cooperative farming agreements, because the CICA only applies to procurements made with appropriated funds. Gov't Reply 7. As an initial matter, this argument was raised, for the first time, in the Government's March 24, 2014 Reply.[34]  It is "well established that arguments not raised in the opening brief are waived." *SmithKline Beecham*, 439 F.3d at 1319; *Eden Isle Marina, Inc. v. United States*, 89 Fed. Cl. 480, 512 n.37 (2009) ("Raising the issue for the first time in a reply brief does not suffice [to avoid waiver]; reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration." (quoting *Novosteel SA v. U.S. Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)).

---

[33] *See CMS Contract Mgmt. Servs.*, 745 F.3d at 1381 ("When using a procurement contract, an agency must adhere to federal procurement laws, including the Competition in Contracting Act (CICA), 41 U.S.C. § 3301, as well as the Federal Acquisition Regulation (FAR).").

[34] Although the Government made a one-sentence reference to this argument, unaccompanied by any analysis, in the "summary of the argument" section of the March 7, 2014 Motion To Dismiss, to avoid waiver a party must present "a developed argument" in its opening brief. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (holding that a party must articulate a "developed argument," as opposed to alluding to "mere statements of disagreement," in its opening brief to avoid waiver); *Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d. Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a 'passing reference to an issue . . . will not suffice to bring that issue before [the] court.'" (quoting *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1066 (3d Cir. 1991)). A one-sentence reference does not "even approach[] a substantive argument," and as such, the court deems the Government's argument waived. *See SmithKline Beecham*, 439 F.3d at 1320; *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim.").

Assuming, *arguendo*, that the Government's appropriated funds argument was not waived, the court nonetheless has determined it is without merit, because it is premised on a misreading of the relevant statutes and unsupported by the Administrative Record.  As a matter of law, again in section 111, "procurement" is defined, for purposes of Subtitle I of Title 41, as including "all stages of the process of *acquiring* property or services."  41 U.S.C. § 111 (emphasis added).  In contrast, section 131 defines "*acquisition,*" *solely for purposes of Subchapter II* (Division B Definitions) of Subtitle I of Title 41, as "the process of acquiring, with appropriated amounts, . . . property or services."  41 U.S.C. § 131 (emphasis added).  Based on this statutory framework, the Government argues that the CICA does not apply to the cooperative farming agreements, because in the CICA, the term "procurement" "only pertains to acquisitions made with appropriated funds."  Gov't Reply 7–8.  Here, the Government imports the definition of "acquisition" as used in Title 41, Subtitle I, Subchapter II, into the meaning of "procurement," that delineates the scope of the CICA's "full and open" competition requirement.  *See* 41 U.S.C. § 111 (defining "procurement" for purposes of Title 41, Subtitle I); *see also* 41 U.S.C. § 3301 (requiring "full and open competition" when an executive agency is "conducting a procurement for property or services").  The text of section 131 makes it abundantly clear that the definition of "acquisition" applies only to Title 41, Subtitle I, *Subchapter II*, and not to any other section in Subtitle I of Chapter 41, including provisions of the CICA.  *See* 41 U.S.C. § 131 ("In division B, the term 'acquisition'— (1) means the process of acquiring, with appropriated amounts, . . . property or services[.]"); *see also 360Training.com*, 104 Fed. Cl. at 586 ("The definition of acquisition in [section] 131 explicitly provides that it only applies to Division B and therefore it does not apply to [section] 111 in Division A.").  Further, the Government posits that "acquisition" and "acquiring" are interchangeable, even though the former is defined in section 131 with a technical meaning, while the latter is a generally understood and statutorily-undefined term.  As such, the Government disregards a congressional choice to use these terms in different ways.  *See Mohamad v. Palestinian Authority*, __ U.S. __, 132 S. Ct. 1702, 1708 (2012) (explaining that courts "generally seek to respect Congress' decision to use different terms to describe different categories of people or things"); *see also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation.  The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."); *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").  As explained above, the term "procurement" is broader than the term "acquisition," and, quite clearly, "had Congress intended for the 'with appropriated funds' clause to apply to 'procurement,' it would ha[ve] included those words in . . . § 111."  *360Training.com*, 104 Fed. Cl. at 586–87.

And, as a matter of fact, the Service personnel who supervised the Cooperative Farming Process in 2013 and 2014 were paid salaries with appropriated funds.  *See* 17 RM § 17.9 (1986) (reprinted at AR 175) (noting that "Congress . . . tells you how much you will have available to run your operation.  You cannot supplement these funds, no matter how great the need or how noble the cause[.]").

For these reasons, the court has determined, as a matter of law and fact, that the cooperative farming agreements at issue in this case are procurements and subject to the requirements of the CICA.

> c. **Whether Any Of The Statutes Cited By The Government Exempt The Service From Complying With The Competition In Contracting Act.**

The Government cites three statutes that it argues exempt the Service's cooperative farming agreements from the CICA.

> i. **The 1958 Fish And Wildlife Coordination Act.**

The Government cites the 1958 Act (codified, as amended, at 16 U.S.C. §§ 661–64), as authority for the Service to use a noncompetitive selection process in awarding cooperative farming agreements. Gov't Mot. 17, 25. Section 664 therein provides that refuge areas "shall be administered by [Interior] directly or in accordance with *cooperative agreements* entered into pursuant to the provisions of section 661 of this title . . . for the conservation, maintenance, and management of wildlife[.]" 16 U.S.C. § 664 (emphasis added). In turn, section 661 authorizes Interior "to provide assistance to, and cooperate with, Federal, State, and public or private agencies and organizations in [supporting] all species of wildlife[.]" 16 U.S.C. § 661. According to the Government, these statutory provisions together "authorize[] the agency to use 'cooperative agreements,' rather than procurement contracts, to promote wildlife conservation." Gov't Mot. 17.

As an initial matter, it is impossible for a 1958 statute to preempt the CICA, which was not enacted until 1984. In addition, the "cooperative agreements" authorized by the 1958 Act have nothing to do with the cooperative farming agreements at issue here. The purpose of the 1958 Act was to "provide for more effective integration of a fish and wildlife conservation program with Federal water-resource developments." Pub. L. No. 85-624, 72 Stat. 563, 563. As such, sections 661 and 664 concern agreements between the Service and other "Federal, State, and public or private agencies and organizations" to coordinate conservation between these various organizations. *See* 16 U.S.C. § 661; *see also id.* § 663 (requiring wildlife conservation plans to be approved jointly by the administrating federal agency, the Secretary of the Interior, and the head of the state wildlife resources agency); *id.* § 664 (allowing lands of value to migratory birds to "be made available without cost directly to the State agency having control over wildlife resources" if this would be "in the public interest"). For example, in order to mitigate wildlife habitat loss due to completion of the McNary Lock and Dam Project, in 1956 the United States Department of the Army made land surrounding the resulting reservoir, known as Lake Wallula, available to Interior for conservation and management of wildlife resources. AR 44; *see also* 62 Stat. 240–41 (1948); McNary National Wildlife Management Area, Washington: Designation of Area and Notice of Applicability of Regulations, 21 FED. REG. 2991 (May 4, 1956). Today, the Service manages this refuge under a *cooperative agreement* with the Army Corps and it is exemplary of the type of "cooperative agreement" identified by 16 U.S.C. § 664. AR 44.

41

Therefore, the cooperative farming agreements in this case are not used to coordinate wildlife protection between the Service and another agency or organization. Instead, they are used to induce private farmers to provide the Service with the means to fulfill their statutory mandate to feed migratory birds and wildlife. As such, the farmer-cooperators function as contractors for the Service. Thus, neither section 661 nor 664 exempt the Service from the competitive requirements of the CICA.

### ii.     The  1966  National  Wildlife  Refuge  System Administration Act.

The second statute cited by the Government is the 1966 National Wildlife Refuge System Administration Act (codified at 16 U.S.C. § 668dd(h)). The Government contends that this statute implicitly exempted the Service's award of cooperative farming agreements, without competition. Gov't Mot. 27. Again, a 1966 statute cannot preempt a 1984 statute. In addition, there is no evidence in the Administrative Record or in legislative history that Congress was concerned with, or even knew that, cooperative farming agreements were being awarded without competition, when the 1966 Act was enacted. *See* 1966 U.S.C.C.A.N. 3342, 3349 ("Subsection (g) [(the original subsection for 668dd(h))] is a technical provision which continues the regulations now applicable to the various areas of the system until modified or rescinded by the Secretary."). As such, section 668dd(h) did not exempt the Service from the competitive requirements of the CICA.

### iii.     The  1998  National  Wildlife  Refuge  System  And Community Partnership Enhancement Act.

The third statute cited by the Government as exempting the Service from the CICA is the National Wildlife Refuge System and Community Partnership Enhancement Act (the "1998 Act"), as amended in 2004 by the National Wildlife Refuge Volunteer Act (codified at 16 U.S.C. § 742f). Gov't Mot. 27–28. Section 742f(d) allows the Secretary of the Interior, "[n]otwithstanding [the FGCAA]," to "enter into a cooperative agreement with a partner organization . . . or other person to implement one or more projects or programs . . . in accordance with the purposes of this subsection." 16 U.S.C. § 742f(d)(2)(A). Subsection (B) of § 742f(d)(2) further states that a cooperative agreement can be used for "habitat maintenance, restoration, and improvement," which encompasses the purpose of cooperative farming agreements. Gov't Mot. 28.

The Government's contention that section 742f(d)'s reference to cooperative agreements includes the type of cooperative farming agreements at issue in this case does not comport with the 1998 Act nor with its legislative history. The stated purpose of the 1998 Act was "to promote volunteer programs and community partnerships for . . . national wildlife refuges." 112 Stat. 1574; *see also id.* § 2(b) ("The purposes of this Act are—(1) to encourage the use of volunteers . . . (2) to facilitate partnerships between the [Refuge] System and non-Federal entities . . . and (3) to encourage donations and other contributions by persons and organizations to the [Refuge] System."). Cooperative farming agreements are not "voluntary programs or community partnerships," but contractual arrangements whereby farmer-cooperators use public land to grow crops, if they reserve part of the yield to feed migratory birds and wildlife.

Moreover, in discussing the proposed 2004 amendments to the Fish and Wildlife Act of 1956, the House Report describes how the *volunteer* programs should work.  H.R. Rep. 108-385, at 1165–66 (2003) (emphasis added).

> [T]he 1998 amendments added a new provision to enhance community partnership with the Refuges. . . .  In light of this expanded authority, the Committee hopes that the Fish and Wildlife Service will examine the usefulness of additional volunteer coordinator positions . . . .  [The 2004 amendments] . . . expand[] the authority for the Secretary of the Interior to hire volunteer coordinators beyond just the pilot programs originally authorized.

H.R. Rep. 108-385, at 1165–66 (2003); *see also* S. Rep. 108-315, at 3 (2004) (observing that the United States House of Representatives adopted an amendment, offered by Rep. Gilchrest, "to expand the authority of the Secretary to hire full-time volunteer coordinators at more Refuges").  Again, the cooperative farming agreements at issue here, unlike the projects and programs listed in section 742f(d), are not agreements between the Service and *volunteers* who perform a service without any benefit.[35]

Finally, when Congress amended the 1998 Act in 2004, it could have exempted the Service from the CICA, but did not do so.  *Compare* P.L. 105-242, 112 Stat. 1574, § 5 (Oct. 5, 1998) ("The Secretary of the Interior may enter into a cooperative agreement (within the meaning of chapter 63 of title 31, United States Code)[.]"), *with* P.L. 108-327, 118 Stat. 1271, § 4 (Oct. 16, 2004) ("Notwithstanding chapter 63 of title 31, United States Code, the Secretary of the Interior may negotiate and enter into a cooperative agreement[.]"); *see also AK Steel Corp. v. United States*, 226 F.3d 1361, 1374 (Fed. Cir. 2000) ("Congress is presumed to know the administrative or judicial interpretation given a statute when it adopts a new law incorporating the prior law."); *cf.* Department of the Interior, Environment, and Related Agencies Appropriations Act, 2010, P.L. 111-88, 123 Stat. 2904, 2923 (Oct. 30, 2009) ("[N]otwithstanding requirements of the Competition in Contracting Act, the Secretary, for purposes of hazardous fuels reduction activities, may obtain maximum practicable competition" among selected entities.).

For these reasons, the court has determined that none of the aforementioned statutes exempt the Service from the competitive requirements of the CICA.

---

[35] Of course cooperative farming agreements could be considered projects and programs to "promote the stewardship of resources of the refuge."  16 U.S.C. § 742f(d)(2)(B)(i).  The Government, however, does not provide any meaningful limitation on the types of agreements that the Service could enter into, pursuant to section 742f(d).  Following the Government's reasoning, the purchase of supplies from "a person" to create signs to protect wildlife from errant hikers equally would fall under the scope of the 742f(d)'s cooperative agreements, because such supplies would "promote the stewardship of resources of the refuge."  *See* 16 U.S.C. § 742f(d)(2).

d.      **The Service's Priority Selection System Violates The Federal Grant And Cooperative Agreement Act.**

Like the CICA, the FGCAA delineates requirements for federal procurement law and uses the terms "property or services." *Compare* 41 U.S.C. § 3301(a) (requiring an agency to use "full and open competition" when procuring "property or services"), *with* 31 U.S.C. § 6303 (requiring that "[a]n executive agency shall use a procurement contract . . . when . . . the principal purpose of the instrument is to acquire (by purchase, lease, or barter) *property or services* for the direct benefit or use of the United States Government") (emphasis added).   In contrast, "[a]n executive agency shall use a cooperative agreement . . . when . . . the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation[.]"  31 U.S.C. § 6305.

In this case, whether the Service violated the FGCAA turns on whether the Service's cooperative farming agreements procure property or services for the "direct benefit or use" of the Government.   The court's decision that they do is informed by *CMS Contract Management Services*, wherein the United States Court of Appeals for the Federal Circuit explained that, in determining whether an agency's decision to use a procurement contract or a cooperative agreement complies with the FGCAA, "'[t]he fact that the product or service produced by the intermediary may benefit another party is irrelevant.'  In the case of an intermediary relationship, 'the proper instrument is a procurement contract.'"  745 F.3d at 1386 (quoting S. Rep. No. 97-180, at 5 (1981)).

As discussed in the jurisdiction section of this Memorandum Opinion and Final Order, the court determined that the intended beneficiaries of the cooperative farming agreement are the migratory birds and wildlife on the McNary and Umatilla Refuges, because Congress charges the Service with this responsibility.  AR 46–47 (McNary Refuge); AR 67 (Umatilla Refuge).  In fact, the Service effectively leases refuge land to farmer-cooperators in exchange for their service in growing crops to feed migratory birds and wildlife in the refuges.  The name of the contractual instrument is irrelevant.  What is relevant is that the FGCAA requires the Service to use a procurement contract whenever it acquires property or services "by purchase, lease or barter."  31 U.S.C. § 6303.  *See CMS Contract Mgmt. Servs.*, 745 F.3d at 1379, 1385–86 (holding that agreements to acquire services to support agency staff and benefit a third party are procurement contracts); *see also 360Training.com*, 104 Fed. Cl. at 585 ("Whatever the agreements are called, the [c]ourt finds that [the agency] . . . . was conducting a 'procurement.'").  The Service did not do so in this case.[36]  Therefore, the court has determined that the Service violated the FGCAA.

-----

[36] The fact that the Refuge Manual also defines "cooperative agreements" broadly to include acquisition of goods and services, further supports Plaintiff's argument that the cooperative farming agreements concern the agency's acquisition of goods and services. *Compare* 41 U.S.C. § 111 (defining "procurement") *and* 31 U.S.C. § 6303 (requiring the use of a procurement contract "to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government"), *with* 5 RM § 17.11(C)(1)(d) ("Cooperative agreements are formal agreements executed by the Service involving the *exchange of goods, services*, or privileges . . . . Care must be exercised to be certain that the goods, services, or

e.    **The 1958 Act Is Not Ambiguous And, In Any Event, 50 C.F.R. § 29.2 Cannot Exempt The Service From The Competition In Contracting Act.**

Section 4 of the 1958 Act (codified at 16 U.S.C. § 664) authorizes the Service to enter into "cooperative agreements" in accordance with Section 1 of the 1958 Act (codified at 16 U.S.C. § 661).  *See* 16 U.S.C. § 664 ("Such areas as are made available to the Secretary of the Interior . . . shall be administered by him directly or in accordance with cooperative agreements entered into pursuant to the provisions of section 661 of this title . . . for the conservation, maintenance, and management of wildlife, [and] resources thereof[.]").  Section 661, in turn, authorizes the Service to "*cooperate with, Federal, State, and public or private agencies and organizations* in the development, protection, rearing, and stocking of all species of wildlife, resources thereof, and their habitat."  16 U.S.C. § 661 (emphasis added).

As a threshold matter, the court has determined that the phrase "Federal, State, and public or private organizations" is not ambiguous, and requires no agency expertise to interpret the plain meaning of the statute.  *See Chevron*, 467 U.S. at 842–83 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); *see also General Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004) (observing that the Chevron step one inquiry involves the "regular interpretative method" of statutory construction).  This phrase simply describes the types of governmental and private entities that need to coordinate to conserve wildlife; this phrase has nothing to do with cooperative farming agreements between the Service and private farmers.  *See MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 229 (1994) ("[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear[.]").

As for the Government's interpretive argument, the 1960 regulation cannot interpret a 1958 Act to exempt the Service from the CICA, which was not enacted until 1984.  In addition, 50 C.F.R. § 29.2 neither sets forth a formal definition nor any reasoning by the Service that supports the Government's proffered interpretation, and therefore is not entitled to deference. *See S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 377–78 (2006) (holding that *Chevron* deference is not required when defining "discharge," because "neither the [United States Environmental Protection Agency] nor [the Federal Energy Regulatory Commission] ha[d] formally settled the definition, or even set out agency reasoning").

Moreover, the Government completely ignores the context in which this phrase is used in the 1958 Act.  The Government contends that the Service has interpreted 16 U.S.C. §§ 661 and 664 "broadly," to read "'public or private agencies and organizations' . . . to mean any 'person,'" thereby authorizing the Service to award cooperative farming agreements to *private* individuals, without competition.  Gov't Mot. 26 (citations omitted).  Pursuant to "the *ejusdem generis* rule of construction the general words are confined to the class and may not be used to enlarge it." *Cleveland v. United States*, 329 U.S. 14, 18 (1946).  Likewise, the suggestion that "agencies," as

---

privileges which *accrue to the cooperator and to the Service* are stated explicitly." (emphases added)).

used in 16 U.S.C. § 661, refers to a principal-agent argument makes no sense in the context of the statute.  The fact that alternative dictionary definitions exist evidences ambiguity, *only if* the alternatives make sense within the context of the statute.  *See MCI Telecomms.*, 512 U.S. at 226 (rejecting the agency's argument that "courts must defer to the agency's choice among available dictionary definitions"); *see also Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 418 (1992) ("The existence of alternative dictionary definitions . . . , *each making some sense under the statute*, itself indicates that the statute is open to interpretation." (emphasis added)); *see also id.* at 418 ("[A] reviewing court need not accept an interpretation which is unreasonable.").

    In addition, 50 C.F.R. § 25.12[37] uses the term "cooperative agreement" to mean the coordination of an agreement between the Service and a state agency to promote wildlife conservation.  That same section describes "refuge management economic activity," as farming on refuge land by a Service-authorized agent or contractor, conducted through the instrument of "cooperative agreements" later described under 50 C.F.R. § 29.2.[38]  It is this second use of the

---

[37] Section 25.12 provides:

> Coordination area means a wildlife management area made available to a State by *cooperative agreement* between the U.S. Fish and Wildlife Service and a State agency having control over wildlife resources pursuant to section 4 of the Fish and Wildlife Coordination Act (16 U.S.C. [§] 664 . . .).

> \* \* \*

> Refuge management activity means an *activity conducted by the Service or a Service-authorized agent* to fulfill one or more purposes of the national wildlife refuge, or the National Wildlife Refuge System mission.  Service-authorized agents include *contractors*, cooperating agencies, cooperating associations, refuge support groups, and volunteers.

> Refuge management economic activity means a refuge management activity on a national wildlife refuge which results in generation of a commodity which is or can be sold for income or revenue or traded for goods or services.  Examples include: *Farming*, grazing, haying, timber harvesting, and trapping.

50 C.F.R. § 25.12 (emphases added).

[38] This regulation provides:

> Cooperative agreements with persons for crop cultivation, haying, grazing, or the harvest of vegetative products, including plantlife, growing with or without cultivation on wildlife refuge areas may be executed on a share-in-kind basis when such agreements are in aid of or benefit to the wildlife management of the area.

50 C.F.R. § 29.2.

term "cooperative agreements" that concerns "cooperative agreements" with persons, not State agencies or organizations.

Of course, the fact that the Government's interpretation is the product of a *post hoc* litigation strategy has not escaped the court. *See State Farm*, 463 U.S. at 50 ("[C]ourts may not accept . . . counsel's *post hoc* rationalizations for agency action. . . . It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." (citation omitted)); *see also Sursley v. Peake*, 551 F.3d 1351, 1355 (Fed. Cir. 2009) (rejecting the Government's proposed interpretation, in part, because a regulatory change did not reflect a "deliberate effort to interpret the statute's meaning" and holding that the relevant inquiry is one of statutory interpretation, not deference to an agency interpretation). In promulgating 50 C.F.R. § 29.2, the Service did not mention any of the alternative definitions proffered by the Government, nor suggest that the statutory phrase "public or private agencies or organizations" was ambiguous or even relevant to section 29.2. *See* 25 FED. REG. at 8,397.

For these reasons, the court has determined that the 1958 Act is not ambiguous and, in any event, 50 C.F.R. § 29.2 cannot exempt the Service from the competitive requirements of the CICA.

### f.      The Service Failed To Comply With Regulatory Authority.

### i.      Standard Of Review.

In *Hamlet v. United States*, 63 F.3d 1097 (Fed. Cir. 1995), the United States Court of Appeals for the Federal Circuit held that,

> regardless of whether a provision of an agency's personnel manual or handbook was published or promulgated under the standards set out in the APA, *such provision is a regulation entitled to the force and effect of law*[,] if (1) the promulgating agency was vested with the authority to create such a regulation; (2) the promulgating agency conformed to all procedural requirements, if any, in promulgating the regulation; (3) the promulgating agency intended the provision to establish a binding rule; and (4) the provision does not contravene a statute. In determining whether a provision was intended to be binding, the court should consider (a) whether the language of the provision is mandatory or advisory; (b) whether the provision is "substantive" or "interpretive"; (c) the context in which the provision was promulgated; and (d) any other extrinsic evidence of intent.

*Id.* at 1103–05 (emphasis added) (analyzing whether an agency's personnel manual could constitute a "regulation of an executive department" within the meaning of 28 U.S.C. § 1491(a)(1)).

In addition, in the bid protest context, the United States Court of Federal Claims only may set aside a bid award if an agency's failure to comply with regulatory guidance prejudices a bidder. *See Lincoln Servs., Ltd. v. United States*, 230 Ct. Cl. 416 (1982) ("In these circumstances, the failure [of the agency] to follow the [agency's] manual did not prejudice plaintiff and did not have a substantial impact on the ultimate award."); *see also Emery*

*Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1088 (Fed. Cir. 2001) (holding that the agency's alleged violation of a purchasing manual was not prejudicial).

> ii.     **The Service's Failure To Comply With The Departmental Manual Was Arbitrary And Capricious And Prejudiced Plaintiff.**

The Departmental Manual explicitly states:

> *Competition* in making awards through cooperative agreements is strongly encouraged and *is expected* in awarding discretionary grants, unless otherwise directed by Congress.   In all cases, bureaus and offices are required to make awards *based on the merits* in accordance with the law.

505 DM § 2.13 (2008) (emphases added).

The Departmental Manual then sets forth the procedures required to implement Interior's goal to award cooperative agreements based on merit:

> If consistent with the statute authorizing the program, bureaus and offices will develop procedures which provide for an independent objective evaluation of the [cooperative farming agreement] applications prior to award.   In developing the procedures, consideration will be given to *ensuring that applications are reviewed and evaluated by qualified reviewers; applications are scored on the basis of announced criteria; applications are ranked; and funding determinations made*.

505 DM § 2.16(A) (2008) (emphasis added).

As to the first *Hamlet* factor, Interior had authority to issue the Departmental Manual. *See* 5 U.S.C. § 552(a)(2)(C) (authorizing federal agencies to issue "administrative staff manuals and instructions to staff").   As to the second factor, nothing in the Administrative Record indicates that Interior's publication of the Departmental Manual did not conform to the requisite procedural requirements, and the parties have not argued otherwise.[39]   As to the third factor, the Departmental Manual states, "[b]ureaus and offices must comply with the provisions of the DM," reflecting that Interior intended this document to be binding authority.   *See* 011 DM § 1.2(B) (2001).   Therefore, the Departmental Manual is a binding agency directive, not just a statement of policy.   *See Hamlet*, 63 F.3d at 1105.   As to the fourth factor, the competitive requirements set forth in the Departmental Manual do not contravene a statute; to the contrary, they further the competitive objectives of the CICA.

Consequently, both of the above-referenced sections of the Departmental Manual require that the Service conduct an objective review of the merits and rank qualified applicants, before

---

[39] The Departmental Manual is published online.   *See Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 839 (1999) (noting that promulgation requires "some act of publication, *i.e.*, dissemination to the public" (referencing WEBSTER'S THIRD NEW INT'L DICTIONARY 1816 (1976)).

the cooperative farming agreements were awarded.  The Service's reliance on a priority system, in this case, however, is inapposite to "an independent objective evaluation."  505 DM § 2.16(A) (2008).  In addition, the Administrative Record does not contain any public notice of the cooperative farming program in the McNary or Umatilla Refuges for either 2013 or 2014 or the Service's criteria for evaluating applicants.  AR 109 (stating that the Service "had not put out a public offering" for the 2013 agreements).  The only reason Mr. Hymas was considered in 2014 was at the direction of the court.  Dkt. No. 38 (transcript of the 6/24/13 Status Conference).[40] Moreover, the priority system, by the Service's admission, is not a competitive merits-based system.  *See* 5 RM § 17.11(A)(1) (1986) (distinguishing the priority system from a competitive bidding system).  Therefore, the Service's priority-based selection system did not comply with the Departmental Manual.  Finally, the conspicuous absence of any reference to the Departmental Manual in the Administrative Record evidences that the Service did not consider it in conducting the cooperative farming selection process either in 2013 or 2014.

For these reasons, the court has determined that the Service's failure to comply with the Departmental Manual was arbitrary and capricious.  *See Hamlet*, 63 F.3d at 1105 (setting forth the test for determining whether an agency manual "is a regulation entitled to the force and effect of law"); *see also* 5 U.S.C. § 706(a)(2) (requiring a court to hold unlawful agency action that is "arbitrary, capricious, an abuse of discretion, or *otherwise not in accordance with law*" (emphasis added)).  That failure prejudiced Mr. Hymas and had a "substantial impact on the ultimate award" of cooperative farming agreements, because if the Departmental Manual was followed by the Service, his proposal would have been ranked, without being automatically discarded, because he was not an incumbent or prior farmer-cooperator.  *Lincoln Servs., Ltd. v. United States*, 230 Ct. Cl. 416, 428 (1982) (concluding that "the failure [of the agency] to follow the [agency's] manual did not prejudice plaintiff and did not have a substantial impact on the ultimate award"); *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954) (allowing a petitioner to challenge a denial of his application for suspension of deportation, where the Board of Immigration Appeals "fail[ed] to exercise its own discretion, contrary to existing valid regulations"); *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others.").

### iii.    The Service's Reliance On The Refuge Manual Was Arbitrary, Capricious, Lacked A Rational Basis, And Prejudiced Plaintiff.

The Government does not dispute that the Service relied on sections 4 and 17 of the Refuge Manual in implementing the priority system in 2013 and 2014.  Gov't Mot. 33; AR 123–

---

[40] On November 21, 2013, the Service requested certain information from Mr. Hymas, but not from other potential cooperators.  *Compare* AR 198 (letter to Mr. Hymas), *with* AR 197 (letter to Mr. Fredrickson, a prior cooperator).  Prior to that time, the Service, however, did not indicate what standard would be used to evaluate his application.  In fact, the Service did not consider Mr. Hymas's farming experience or ability to supply necessary farming equipment.  *Compare* AR 198, *with* AR 212 (post-award 1/17/14 Stenvall Statement explaining that selections were made solely on the basis of an applicant's status as a prior farmer-cooperator).

78 (Refuge Manual); AR 73 ("Cooperators are selected in accordance with Refuge [M]anual guidelines[.]"); AR 89–92 (identifying the priority system in the Refuge Manual as the method of selection for the 2013 farming season); AR 190 ("[T]he only criterion for selecting cooperators [for the 2014 farming season] is their capability to perform the requirements of the cooperative farming agreement.  Considerations relevant to their capability to perform. . . . are encompassed in the priority system outlined in 5 RM [§] 17.11(A)(1)(c).").  But, the Refuge Manual was not in effect when the Service conducted the selection process for the 2013 and 2014 farming seasons.  *See* Director's Order No. 42 (revoking the Refuge Manual, effective September 30, 1993).  Although a series of amendments extended that revocation date, the last amendment to do so prior to the Service's selection process was the December 31, 2006 Amendment 14, that extended the revocation date to December 31, 2007.  Therefore, no Service policy authorized the use of a priority selection process in 2013 and 2014.  *See Wos v. E.M.A. ex rel. Johnson*, __ U.S. __, 133 S. Ct. 1391, 1402 (2013) (holding that two documents "lack persuasive force," in part, because they "no longer reflect the agency's position"); *cf.* 516 FW § 6.4 (2014) (requiring competition, unless certain provisions, listed at 516 FW § 6.7 tbl. 6-3, are met);*supra* note 28 (describing the provisions listed at 516 FW § 6.7 tbl. 6-3).

The Government counters that the post-Complaint February 26, 2014 Amendment 15 to the Director's Order No. 42 retroactively reinstated the Refuge Manual and authorized the Service's use of a priority selection process in 2013 and 2014.  Gov't Mot. 32–33.  The court disagrees.  Whatever legal effect Amendment 15 has on the Refuge Manual after February 26, 2014, it had none on Service actions that occurred before the amendment.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (holding that the "threshold question" in determining the validity of a retroactive rule is whether the relevant statute "authorizes retroactive rulemaking"); *see also id.* ("Retroactivity is not favored in the law."); *see also Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 745 (D.C. Cir. 1986) ("[C]ourts have long hesitated to permit retroactive rulemaking and have noted its troubling nature.").  Instead, in this case, the Service attempted to justify a priority system based on the Refuge Manual, which was not published[41] and was superseded by the Departmental and Service Manuals.[42]  In other words, the Service "change[d] the rules of the game'" by retroactively

---

[41] In fact, Mr. Hymas had to file a Freedom of Information Act request in order to obtain a copy of the Refuge Manual.  Pl. MJAR 15.  The Service has made two public statements about the Refuge Manual.  One, that the Refuge Manual was revoked.  *See* Tom Worthington, U.S. Fish & Wildlife Serv., *Two Dogs, One Cat and Three Refuge Manuals*, *available at* http://www.fws.gov/refuges/refugeupdate/marchapril_2011/refugemanuals.html  ("Today, the Service Manual has replaced the Refuge Manual[.]").  Second, on February 28, 2014, the Service published a "[c]orrection" to Mr. Worthington's article, indicating that "[t]he Refuge Manual . . . [has] not been revoked."  *Id.*

[42] The court need not, and does not, reach the issue of whether Amendment 15 lawfully reinstated the Refuge Manual, but to the extent it has any prospective vitality, the court observes that the Service Manual places significant restrictions on a Director's Orders:

Director's Orders are limited to temporary delegations of authority, emergency directives, special assignments, and initial policy or guidance for evolving

resurrecting the Refuge Manual. *See Bowen*, 488 U.S. at 220 (Scalia, J., concurring) ("A rule that has unreasonable secondary retroactivity—for example, altering future regulation in a manner that makes worthless substantial past investment incurred in reliance upon the prior rule—may for that reason be 'arbitrary' or 'capricious,' see 5 U.S.C. § 706, and thus invalid.").

Assuming *arguendo*, the Refuge Manual properly was re-instated, the principal reason used by the Service to justify its use of a priority system, was that "[o]ne of our main concerns in selection of cooperators is that the cooperator may be unable to complete the project (due to illness, bankruptcy, or lack of necessary equipment or skill)." AR 190. But, the Service did not ascertain, much less consider, any information about a farmer's *ongoing* ability to complete the project, such as financial data, health record, or ability to obtain required equipment. *Compare* AR 194–97 (allowing prior cooperators to express interest in continued participation without submitting any questionnaire), *with* AR 198 (requesting that Mr. Hymas submit a response that includes "a written description of . . . work experience in farming" and "statement of capability demonstrating [his] ability to supply irrigation systems and farm equipment"). As such, the Service also failed to comply with the requirement of the APA that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted). The priority system, as set forth in the Refuge Manual, does not consider prior *performance*; instead, incumbent or prior cooperators automatically receive priority over all other applicants. *See* 5 RM § 17.11A(1)(c)(1) (1986) (allowing the Service to refuse a renewal of a cooperative farming agreement *only* for "[n]on-compliance" with the "provisions of the previous permit or agreement"). Relying on the priority system that ensures an incumbent or prior farmer-cooperator will continue to be awarded cooperative farming agreements in near-perpetuity, was arbitrary, capricious, lacked a rational basis and prejudiced Mr. Hymas, as well as other potential farmer-cooperators.

For these reasons, the court has determined that the Service's reliance on the Refuge Manual was arbitrary, capricious, lacked a rational basis, and prejudiced Mr. Hymas.

**C.    A Permanent Injunction Is Warranted.**

**1.    Plaintiff's Argument.**

The February 5, 2014 Amended Complaint requests, among other relief, that the court:

Enter a permanent injunction that orders Defendant to rescind the multi-year farming contracts awarded in 2013 and open the related fields to competitive bidding in 2014;

---

activities. Originating offices must convert Director's Orders as soon as possible into the Service Manual.

010 FW § 1.5(B) (2011, as amended 3/6/14); *see also* 012 FW § 1 (2006) ("Preparation and Issuance of Director's Orders"); *see also Bowen*, 488 U.S. at 208–09 ("Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant.").

Enter a permanent injunction that orders Defendant to award Plaintiff a contract to farm Library Field, Field 3 and Field 4;

Enter a permanent injunction that prohibits Defendant from awarding farming contracts until [the Service] conducts a procurement that complies with the Competition in Contracting Act and FGCAA[.]

Am. Compl. at 12; *see also* Pl. MJAR 20 (reiterating the previous requests and also requesting that the court cancel the Service's 2014 cooperator selections and re-do the selection process).

Without injunctive relief, Mr. Hymas claims that he and other similarly-situated farmers will be unable to compete for cooperative farming contracts in the Umatilla and McNary Refuges. Pl. Resp. 19. Although the Government points to critical planting deadlines, the Service could meet these deadlines through either force account farming or contract farming (using third parties). Nor should the existence of multi-year agreements be allowed to frustrate injunctive relief; "[t]hat the [G]overnment may be exposed to breach of contract claims by existing cooperators as a result of its unlawful conduct is not a reason to deny injunctive relief." Pl. Resp. 20. At a minimum, the court should require full and open competition for the 2015 farming season and in the future to prevent the Service "from repeatedly avoiding the consequences of unlawful conduct by delaying its award of farming contracts until the eve of the planting season." Pl. Resp. 20.

## 2.   The Government's Response And Cross-Motion.

The Government responds that Mr. Hymas, as a disappointed bidder, has "no right . . . to have the contract awarded to [him] in the event the . . . court finds illegality in the award of the contract." Gov't Mot. 45 (quoting *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1152–53 (Fed. Cir. 1994) (internal quotations omitted)). In any event, "a movant is confronted by a more substantial burden of proof when it seeks injunctive relief which would interfere with and infringe upon governmental operations if granted." Gov't Mot. 45–46 (citing *Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173, 226 (2005) (finding that "only . . . extremely limited circumstances" warrant enjoining performance). Moreover, using third parties or Service personnel to conduct preparatory work to meet critical deadlines is not possible, because of current funding constraints. Gov't Reply 10.

Nor can Plaintiff meet the four elements that a court must consider when deciding to issue a permanent injunction. Gov't Mot. 46 (citing *PGBA, LLC v. United States*, 389 F.3d 1219 1228–29 (Fed. Cir. 2004) (listing the four elements)). First, Plaintiff cannot succeed on the merits, because the Service did not abuse its discretion or act without rational basis in the award of the cooperative farming agreements. Gov't Mot. 46.

Second, Plaintiff does not have any competitive injury, because the Service "fairly considered Mr. Hymas for each of the [cooperative farming agreements] at issue." Gov't Mot. 46–47 (citing AR 85–88 (2013 Stenvall Statement); AR 89–92 (2013 Glass Statement); AR 212–15 (2014 Stenvall Statement)).

Third, "the compelling and overriding interest of the United States and the public in providing critical food assistance to migratory birds" outweighs any harm to Mr. Hymas. Gov't Mot. 47. As to an injunction for 2014 planting season, Mr. Glass declared:

> If an injunction were to prevent . . . cooperating farmers . . . from providing . . . irrigation for more than one week, due to the biological realities of farming, it is likely that no corn, wheat, barley, or alfalfa could be successfully grown in 2014[.]

> In light of current funding constraints, the [Service] does not have the ability to satisfy the critical need of wildlife for this food except through the use of agreements, such as cooperative farming agreements, that do not require expenditure of public funds.

3/7/14 Glass Decl. ¶¶ 9–10; *see also* Gov't Mot. 47–48 (discussing the 3/7/14 Glass Declaration). Insufficient time remains to engage in full and open competition for the 2014 farming season. Gov't Reply 10.

Fourth, any injunction that affects multi-year cooperative farming agreements "would likely frustrate the purpose of the agreements by impairing the ability of the cooperators to recoup their investment costs," which weighs against injunctive relief. Gov't Mot. 49 (quoting Glass Decl. ¶ 11).

Finally, the court should not consider injunctive relief as to future farming cycles, because the Service "has not made any final decisions with respect to future farming cycles and the issue of future farming cycles is not before the [c]ourt." Gov't Reply 11.

### 3.      The Court's Resolution.

As a matter of law, the court is required to consider and balance four factors in determining whether to issue an injunction:

> (1) whether . . . the plaintiff has succeeded on the merits of the case;

> (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief;

> (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and

> (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC*, 389 F.3d at 1228–29; *see also FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) ("No one factor, taken individually, is necessarily dispositive . . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others.").

The court agrees with the Government that an injunction awarding one or more cooperative farming agreements to Mr. Hymas is not a proper remedy. Therefore, the request "to award Mr. Hymas a contract to farm Library Field, Field 3 and Field 4," Pl. MJAR 20, is denied.

As to the first factor, as discussed herein, the court has determined that Mr. Hymas has succeeded on the merits, by demonstrating that the Service's use of a noncompetitive selection process for the cooperative farming agreements in 2013 and 2014 violated two federal procurement laws, as well as the APA. *See PGBA,* 389 F.3d at 1229 (quoting *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.")).

As to the second factor, the court has determined that Mr. Hymas will be irreparably harmed by the lost opportunity to compete for cooperative farming agreements for the next five years, without injunctive relief requiring the Service to comply with the CICA, FGCAA, and APA. *See PGBA,* 389 F.3d at 1231 (noting that "evidence of lost profits" may demonstrate irreparable harm); *United Payors & United Providers Health Servs., Inc. v. United States,* 55 Fed. Cl. 323, 333 (2003) ("[L]ost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm."); *see also Labat-Anderson Inc. v. United States,* 50 Fed. Cl. 99, 110 (2001) ("Lost profits and a lost opportunity to compete constitute irreparable injury.").

As to the third factor, although the Service may be inconvenienced by having to implement a competitive selection process for the 2015 farming season and beyond, this is a problem the Service brought on itself. *See Parcel 49C Ltd. P'ship,* 31 F.3d at 1152–53 ("[A]n injunction to halt the contract award [is] the correct remedy for illegality in the bid process." (citing *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1575 (Fed. Cir. 1983)); *see also Cohen Fin. Servs. v. United States,* 110 Fed. Cl. 267, 289 (2013) (explaining that hardship "wholly attributable" to the Government's "unexplained failure [to follow its regulations]" does not preclude issuance of injunctive relief). The court is mindful that an injunction setting aside the five-year cooperative farming agreements entered into in 2014, may well result in the Service having to deal with collateral contract claims, but the Service's exposure is the result of willful unlawful conduct that it should have corrected in 2014—as the court expected the Service to do. *See Turner Constr. Co. v. United States,* 645 F.3d 1377, 1388 (Fed. Cir. 2011) ("Injunctive relief is appropriate if it 'enjoin[s] the illegal action and return[s] the contract award process to the status quo ante.'" (quoting *Parcel 49C Ltd. P'ship,* 31 F.3d at 1153)).

As to the fourth factor, the court also is mindful that the public interest weighs against potential disruption of supply of migratory bird and wildlife food. *See* 16 U.S.C. § 701 ("The duties and powers of the Department of the Interior include the preservation, distribution, introduction, and restoration of game birds and other wild birds."); *see also* Exec. Order No. 13,186 (Jan. 10, 2001) ("Responsibilities of Federal Agencies to Protect Migratory Birds"). The Service, however, has sufficient time to establish a new procurement process for 2015 and beyond particularly since, in prior years, this process did not commence until the late fall and cooperative farming agreements were not entered into until the following April.

Finally, the court has not overlooked the fact that the Service attempted on two occasions to "paper over" its failure to provide a rational basis for awarding cooperative farming

agreements in 2013 and 2014. This conduct alone would justify injunctive relief in this case, because the public interest is served by "honest, open, and fair competition" and "the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003).

For these reasons, it is ordered that,

the United States of America, the United States Department of the Interior, the Fish and Wildlife Service, and their officers, agents, employees, and representatives are enjoined from entering into any cooperative farming agreements or other contractual vehicles concerning the McNary and Umatilla National Wildlife Refuges for the 2015 farming season or thereafter, unless and until the selection process and award comply with the CICA, FGCAA, and the APA.

| Cooperator | Company | Start Date | End Date | Fields | Administrative Record Citation |
|---|---|---|---|---|---|
| Lonnie Blasdel | GLB Farms | Mar. 19, 2013 | Mar. 30, 2016 | McNary Library Field, Fields 3a–d, 7a–c | AR 26 |
| Larry Pierce | N/A | Mar. 1, 2013 | Feb. 28, 2017 | McNary Pierce Field | AR 21 |
| Vern Frederickson | Frederickson Farms | Feb. 25, 2014 | Jan. 1, 2019 | Umatilla McCormack Fields C-1 through C-5 | Dkt. No. 41 |
| Jody Maddox | N/A | Mar. 1, 2014 | Mar. 1, 2019 | Umatilla Whitcomb Fields C-1 through C-6 | Dkt. No. 41 |
| John Peterson | N/A | Mar. 15, 2014 | Mar. 15, 2019 | McNary Fields 5, 6a–c, 8 | Dkt. No. 41 |
| Doug Strebin | Basin Farming LLC | Mar. 15, 2014 | Mar. 15, 2019 | McNary Wallula Field 1 | Dkt. No. 41 |

## V.    CONCLUSION.

For these reasons, the Government's March 7, 2014 Motion To Dismiss is denied. Plaintiff's February 17, 2014 Motion For Judgment On The Administrative Record is granted in-part and denied in-part. The Government's March 7, 2014 Cross-Motion For Judgment On The Administrative Record is denied.

In addition, at the conclusion of the 2014 farming season, the Service will terminate the cooperative farming agreements identified above.

On or before October 24, 2014, Plaintiff may submit a motion for bid and proposal costs. *See Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 629, 630–31 (2002) ("To be awarded bid and proposal costs in a successful bid protest action, the contractor . . . must show those bid and proposal costs to be allocable and reasonable." (citing *Coflexip & Servs., Inc. v. United States*, 961 F.2d 951, 953 (Fed. Cir. 1992) ("Recovery can be obtained [for proposal preparation costs] if the government breached an implied-in-fact contract to treat a bid honestly and fairly, in which case its conduct was arbitrary and capricious toward the bidder-claimant." (internal quotations omitted)))).  At the appropriate time, Plaintiff also may file a motion for attorney fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, if applicable.

**IT IS SO ORDERED.**

s/ Susan G. Braden   
**SUSAN G. BRADEN**
**Judge**

**Court Exhibit 1: McNary And Umatilla Refuges: Overview.**



*Source:* McNary & Umatilla CCP, Map 1.

**Court Exhibit 2: Umatilla Refuge.**



*Source:* U.S. Fish & Wildlife Serv., Umatilla National Wildlife Refuge Hunting Regulations (2013), http://www.fws.gov/mcriver/regulations/documents/umatilla-boardman-etc.pdf.

**Court Exhibit 3: McNary Refuge.**



*Source*: U.S. Fish & Wildlife Serv., McNary National Wildlife Refuge Fishing Regulations (2013), http://www.fws.gov/mcriver/regulations/documents/mcnary-fishing.pdf.

**Court Exhibit 4: McNary Refuge, All Fields.**



*Source:* Pl. MJAR App'x 564.

**Court Exhibit 5: McNary Refuge, Wallula Unit Field 1.**



*Source*: AR 5.

**Court Exhibit 6: McNary Refuge, Burbank Slough Unit Fields 5, 6, and 8.**



*Source:* U.S. Fish & Wildlife Serv., McNary National Wildlife Refuge Hunting Regulations (2013), http://www.fws.gov/mcriver/regulations/documents/mcnary-headquarters.pdf.

**Court Exhibit 7: Umatilla Refuge, McCormack Unit Fields 1–5.**



*Source*: AR 10.

**Court Exhibit 8: Umatilla Refuge, Whitfield Unit Fields 1–6.**



*Source*: AR 15.